The appellant, the Baltimore Life Insurance Company, on the 6th day of August, 1915, issued an insurance policy on the life of John Calvin Fahrney with the appellee, Rose Alba Fahrney, named as beneficiary. *Page 224 
On the morning of April 20th, 1916, the insured was found by his wife in a dying condition upon the floor of his bedroom, in his residence in Hagerstown, Maryland, with a gash upon the left side of his throat, which severed the external jugular vein. He died shortly after being discovered by his wife from hemorrhage resulting from the severance of the vein.
Upon the appellant's refusal to pay the amount named in the policy, to wit, the sum of five hundred dollars, this suit was instituted.
The policy contained the following clause:
 "The death of the insured by his or her own hand, whether sane or insane, within one year from the date hereof, is not within the risk covered by this policy, and in case thereof nothing shall be due the beneficiary hereunder."
The case was first tried by jury in the Circuit Court for Washington County, the defense being that his death was caused by his own hand, within the period named in the policy. The trial resulted in a verdict for the plaintiff for the sum of five hundred and seventeen dollars and fifty-eight cents ($517.58), but upon motion of the defendant a new trial was granted and subsequently the case was removed to the Circuit Court for Allegany County, where it was tried, again resulting in a verdict for the plaintiff.
In the progress of the last trial and when much of the evidence had been offered, four additional pleas were filed setting up the defenses that the insured had obtained said policy by false and fraudulent misrepresentations made in his application therefor — (1 and 2) as to the use of intoxicants, (3) that he had undergone no surgical operation, and (4) that he had never had rheumatism. To these pleas the palintiff replied that upon the facts stated in the replications the defendant was estopped from making the defenses set up in the additional pleas, or that he had waived such defenses. *Page 225 
To these replications a demurrer was filed, which was sustained as to the second plea, but overruled as to the others.
In the course of the trial below one exception was taken to the ruling of the Court upon the evidence, and one to its ruling upon the prayers.
Three of the four rejected prayers of the defendant asked that the jury be directed to find a verdict for the defendant for the following reasons: (1) that there was no legally sufficient evidence to entitle the plaintiff to recover; (2) that it appears from the uncontradicted evidence in the case that Fahrney came to his death by self-destruction, and (3) that the manner of his death, the facts and circumstances in connection therewith and his physical condition, habits and mode of life established that he committed suicide.
These prayers are, in effect, an application to the Court to decide, as a matter of law, upon the evidence offered, that the insured intentionally and designedly took his own life.
The presumption of law is that the death of the insured was due to accident or natural causes, and the fact that it resulted from a wound made with a razor does not change the presumption, which is that the wound was the result of an accident; and the burden of proof is upon the defendant to show by a preponderance of evidence that it was not the result of accident. Royal Arcanum
v. Brashears, 89 Md. 630; Travelers Ins. Co. v. Nicklas,88 Md. 470; Bliss on Life Insurance, sec. 337; Travelers Ins.Co. v. McConkey, 127 U.S. 661; Mallory v. Travelers Ins.Co., 47 N.Y. 54; Guardian Life Ins. Co. v. Hogan, 80 Ill. 35;Home Benefit Association v. Sargent, 142 U.S. 691.
The insured for some time prior to his death had been confined to his home suffering from both lung and heart trouble. Dr. Hoff, who was called in to see him on the 8th of March preceding his death, said he complained of "shortness of breath, coughing, loss of appetite, night sweats, expectorating a great deal and feeling extremely weak." He prescribed for him, but he did not respond to the treatment and *Page 226 
grew gradually worse. The insured, as he stated, had tubercular lesions of both lungs and his heart "was running from 112-16 to 120." When asked if the insured was of a cheerful disposition, the doctor replied: "It is rather my custom to go in a sickroom in a cheerful condition. Q. How did you find Mr. Fahrney? A. He seemed to respond in the same manner." The witness further testified that he was subject to sudden fits of coughing of rather a violent nature, and his heart was in such condition that it was liable to collapse at any time. His heart muscles were in that condition that they might give way at any time and that he might suffer acute dilation of the heart and die suddenly.
The appellee testified that on the morning of the 20th of April, the day upon which the insured died, she first saw him about 6 o'clock, and then later about 8 or 9 o'clock, when he said: "Rose, bring my shaving mug, razor and water; I want to shave." He said he did not feel strong that morning and asked her to "fix everything in the chair," which she did, after placing a chair near the bed so that he could sit on the side of the bed while shaving. She also put a pitcher on the chair and propped a mirror against it and went out, but before going out of the room he said to her: "Rose, when I am through shaving bring me a glass of milk and the evening paper; I want to read it." After leaving him she went about her household duties, which called her to other parts of the house. She returned in about twenty minutes, thinking he had finished shaving, and when she opened the door of his room she saw him lying on the floor on his face, with his left hand under him, and as she entered he said to her, as she thought, "Good-bye," and that was all he said. "The comb, brush and mirror laid on the floor; the shaving mug and water pitcher was upset on the chair, and the razor was lying on the chair partly open," and the body on the floor between the chair and the bed. She also stated it was his custom, before becoming so ill, to shave every Sunday morning and sometimes during the week, but when he became so *Page 227 
weak he was not so regular in shaving. His death occurred on Thursday, and he had not shaved since the Sunday of the preceding week; and he said her, "There were so many people coming in and he was looking so rough, he would like to shave — he didn't care to look too tough when people were coming in every day."
Upon cross-examination she testified that she heard a noise about five minutes before returning to the insured's room, but did not know whether it was in the house or on the street. She further testified there was blood on the floor and upon the insured's clothes, but very little on the pillow or bed. The chair was beside the bed, near its head, and the body between the chair and bed, with his head toward the head of the bed. The left cheek was shaved, but she did not make such an examination of him as to enable her to state accurately just how much of his face had been shaved. She also saw lather on the paper showing that he "had started to shave."
Dr. Hoff, who was sent for by Mrs. Fahrney after discovering her husband in the condition described by her, testified that when he entered the room he saw the insured lying in a pool of blood. He then examined the wound and found that at its deepest point it was about a third of an inch. It severed the external jugular vein, which in his case was about one-quarter of an inch beneath the skin. The incision had a direct course and was a clean-cut wound, starting about one inch or a little more below the ear and extending to a point about one-half inch from the medial line of the chin. The body was in front of the bed along the side of it, and between it and a chair that was located about one and one-half feet from the bed. He "noticed that he had the left side of his face shaven; the right side was unshaven." His death, Dr. Hoff stated, resulted from hemorrhage, caused by the severance of the jugular vein.
Joseph Sharer, an acquaintance of the insured, who at times visited his home, testified that on a visit to the insured. *Page 228 
three or four days before his death, he found him in "different moods; he was cheerful at times, slept a while, and then at times said he was suffering"; and that he told him "he was getting tired of being sick; thought he would end it all."
Isaac Long, the Sheriff of Washington County; John Ankeney, a justice of the peace, and John H. Bittner were at the house of the insured, after the visit of Dr. Hoff, and saw the insured lying upon the floor of his room in the position in which the appellee had found him. Long saw and examined the razor, which at the time was on the chair closed. Ankeney heard Mrs. Fahrney say she "did not see why he did it." Bittner said, "There was a chair right at the head of the bed," and the body was lying alongside of the bed with his head very close to the chair. The testimony of these witnesses in describing the condition of the wound and the appearance of the room, etc., was practically the same as Dr. Hoff's evidence.
Drs. Littlefield and Cowherd, who had heard the testimony in the case, when called to the stand by the defendant, testified in substance that they did not think it reasonably probable that the wound was accidentally inflicted as a result of a sudden collapse of the heart or a sudden paroxysm of coughing; and Dr. Littlefield, in giving a reason for such conclusion, said, in speaking of the insured: "If he has a sharp instrument in his hands and would be seized with a coughing spell, the automatic impulse would be to get that blade away from his face. You can call that involuntary or automatic. His subconscious mind would control his arm to get that razor away." He was then asked, "If he had his razor in his hand and was seized with a sudden fit of coughing, the natural thing would be that the cough would force his hands down. Ans. Yes. Q. And if he had the razor in his hand, when it was forced down, the razor would cut? Ans. If the razor would come in contact with the flesh. Q. If he had the razor against the flesh and the hand were moved down, the razor would cut? Ans. If he had the blade against *Page 229 
his face, I admit, the razor would cut." Other witnesses testified, but we do not deem it necessary to further prolong this opinion by stating the same.
In passing upon the action of the Court in rejecting these prayers we are not called upon to decide whether there is a preponderance of evidence in favor of suicide or death by accident, but as we have said we are asked to decide as a matterof law that upon the evidence offered the insured intentionally and designedly took his own life. To warrant us in so deciding, the evidence offered to overcome the presumption of death from accident should be so convincing that there could not reasonably be two opinions touching the result; for if it were otherwise, it would be an invasion of the province of the jury to take the case from it. The question here, then, is, are the facts proved such as to exclude every other reasonable inference than that the insured voluntarily took his own life.
The insured was suffering from troubles that in all probability would soon have resulted in his death, but there is nothing in the record showing any unusual despondency on his part, or that he entertained any thought of taking his life, save the expression he is said to have made to the witness, Sharer, the weight of which, of course, largely depended upon the connection and manner in which it was said. The conversation in which the expression is said to have been made was at least three days before the day of his death, and although the same means and opportunity of self-destruction were available to him at that time, as on the occasion of his death, the suicidal intention, if it then existed, was not carried into effect for more than three days thereafter. Expressions of this kind are frequently made by persons in his condition with no real intent to carry out the purpose therein stated.
Dr. Hoff, a witness called by the defendant, who saw him every day or two said, that he always found him cheerful; and we may add, that the direction to his wife to bring to him his shaving outfit, stating his reasons for wishing to *Page 230 
shave, that he was looking rough and did not want his friends to see him in that condition, and his further direction, that when he had finished shaving he wished her to bring him in a glass of milk and his newspaper, that he might read it, together with the facts that he had partially shaved when the wound resulting in his death was inflicted, strongly indicates that he had, when he asked for the razor, no suicidal intent.
Had he intended to take his life at that time why should he have partially shaved? He had the razor, the instrument with which to execute his purpose or design, and had it been his intention to take his life he in all probability would have proceeded at once to execute such purpose, fearing probable interference or resistance in so doing.
The evidence offered to overcome the presumption of death from accident is not, we think, so convincing as to enable us to say there could not reasonably be two opinions as to how he met his death, by accident or suicide. For analogous cases supporting this view see Cox v. Royal Tribe of Joseph, 60 L.R.A. 620;Beckett v. Northwestern Masonic Aid Asso., 67 Minn. 298, 69 N.W. 923; Supreme Council of R.A. v. Brashears, 89 Md. 624,43 A. 866; Goldschmidt v. Mutual L. Ins. Co., 35 N.Y.S.R. 121, 12 N.Y. Supp. 866; and other cases cited in Cox v. RoyalTribe of Joseph, 60 L.R.A. 620, supra.
From what we have said the Court was right in rejecting these prayers; and what we have said as to the effect of the evidence against the presumption of death from accident, the Court committed no error in rejecting the defendant's eighth prayer. The first, second and third prayers of the plaintiff, we think, properly states the law of the case. The fourth prayer of the plaintiff was rejected.
There was no error in the Court's ruling in excluding evidence offered in the first bill of exception, under the pleadings at that time. *Page 231 
We now come to the rulings of the Court on the demurrer to plaintiff's first and third replications to the aforesaid additional pleas of the defendant.
The third replication to said pleas of the defendant stated, that in the former trial of the case one of the attorneys for the defendant in his opening statement to the jury, stated that the defense could be made for breaches of warranties in the application of the insured, but that it did not desire to do so and that the only defense that would be made was that the insured had committed suicide and that the plaintiff relying upon said statement and in consequence thereof incurred the expense of prosecuting said cause in Allegany County, and relying upon said statement the plaintiff had come to Cumberland unprepared to meet the issues presented by said pleas and that a fair and just trial of said issues could not be had without procuring witnesses to meet said issues and that the defendant should not be permitted at such time to set up said defenses.
The willingness of a defendant at one trial to risk his case before a jury, upon a single defense does not preclude it, at a subsequent trial, from insisting upon other defenses involving the merits, unless he has abandoned such other defenses or takes a ground inconsistent with that taken at the former trial.Mouler v. American Life Insurance Co., 111 U.S. 335; 29Cyc. 1033 1034.
Upon the facts stated in the third replication the defendant was, we think, estopped at the time the pleas were filed from setting up the defenses embraced in said additional pleas. The attorney for the defendant in his opening statement to the jury in the former trial had stated that he could make other defenses, at the time stating them, but would not make them, but would rely upon the sole defense of suicide. The case was thereafter removed to another county and no pleas were filed setting up such additional defenses, until after evidence had been offered in the second trial, nor was there any intimation given to the plaintiff of an intention on his part to make such other defenses. The plaintiff in the *Page 232 
prosecution of his suit, assuming that the defense of suicide would be the sole defense, as he had a right to assume, prepared only to meet the sole defense of suicide and carried with him witnesses to meet such defense.
To have required the plaintiff to meet such additional defenses under these circumstances would have imposed upon her a hardship that should not have been inflicted upon her. The better practice probably would have been for the plaintiff to have asked that such pleas be not received; and it would have been the duty of the Court under the circumstances stated, not to have received them, but as the same result was reached by filing said replication we will treat them as a proper reply to the pleas. The first replication may have been insufficient for such purpose, but as the Court's ruling upon the third replication is deemed sufficient, there can be no reversible error, in the Court's ruling on the first replication.
It therefore follows from what we have said that the judgment below should be affirmed.
Judgment affirmed, with costs to the appellee. *Page 233