## THE TRAVELERS INSURANCE COMPANY *vs.* CLARA D. CONNOLLY.

*Life Insurance—Suicide—Burden of Proof—Question for Jury.*

In an action on a life insurance policy, on an issue as to suicide, it was proper to instruct the jury that where death results from a pistol shot wound, self-destruction is not presumed, but the law presumes that the wound is the result of accident; and the burden is on the defendant to show by a fair preponderance of testimony that the shot was intentionally self-inflicted and was not the result of accident; and that unless the jury find from the evidence that the insured intentionally shot himself, the verdict must be for plaintiff.      pp. 556, 565

The burden upon defendant, in an action on a life insurance policy, to prove the defense of suicide, is not shifted by the facts that insured had been accused of misappropriating money and, either before or after, purchased a pistol, and was subsequently found with a pistol wound through his head.      p. 565

Where the burden is on one to prove a fact, it is not for the court to say whether that burden has been met, and to with-

draw a case from the jury at the instance of him upon whom
the burden rests.                                    pp. 565, 566

In an action on a life insurance policy, it was proper, in
connection with the defense of suicide, to refuse prayers that
there was no legally sufficient evidence to show that there was
any reasonable probability that death was due to any other
cause than suicide, and that it appeared from the undisputed
evidence that death was due to suicide.            pp. 565, 566

In an action on a life insurance policy, on an issue as to sui
cide, testimony that insured, a right-handed man, was killed by
a bullet which entered on his left side, must be taken as true
for the purpose of prayers instructing the jury that there is
no sufficient evidence to show a reasonable probability that he
did not commit suicide, and that it appears from the undis-
puted evidence that his death was due to suicide.   pp. 566, 567

Where the questions asked a witness were not objected to,
and the testimony was not admitted subject to exception, there
was no error in refusing to strike out the testimony.     p. 567

On an issue as to the suicide of the insured, whose death
occurred shortly after a question had been raised as to his
having signed, in behalf of a certain company, in which he had
an interest, checks on a bank of which he was manager, *held*
that his statement, made before any question was raised as to
his having drawn the check, that he drew it to pay for material
sold to the company, was admissible to show his good faith in
drawing the check.                                        p. 567

Evidence was also admissible to the effect that this particular
material had never been paid for otherwise than by this check,
this going to show that, while the president of the company
denied insured's authority to draw the check, he had gotten the
benefit of the proceeds.                                  p. 567

*Decided April 10th, 1924.*

Appeal from the Superior Court of Baltimore City
(HEUISLER, J.).

Action by Clara D. Connolly against the Travelers Insur-
ance Company. From a judgment for plaintiff, defendant
appeals. Affirmed.

Plaintiff's prayer was as follows:

The court instructs the jury that where death results from a pistol shot wound, self destruction is not presumed, but the law presumes the wound was the result of accident; and the burden of proof in this case is upon the defendant to show by a fair preponderance of testimony that the shot was intentionally self-inflicted, and that it was not the result of accident; and unless the jury find from the evidence in this case that Vincent A. Connolly intentionally shot himself, the verdict of the jury must be for the plaintiff in the full amount of the two policies sued on, to wit: ten thousand dollars ($10,000.00) ; and the jury in their discretion may allow interest on said sum from December 2, 1921. Granted.

Defendant's prayers were as follows:

*First.*—The jury are instructed that the policies of insurance sued upon in this case contain the following provision: "Suicide—In case of suicide committed while sane or insane within one year from the date on which this insurance shall become effective, the limit of recovery hereunder shall be the premiums paid." It appears from the undisputed evidence that premiums amounting to $143.00 were paid by the assured, Vincent A. Connolly, upon these policies prior to his death. It also appears from the undisputed evidence that the assured, Vincent A. Connolly, came to his death before the expiration of one year from the time the policies went into effect, so that if the assured committed suicide, the plaintiff is only entitled to recover in this case the said amount of $         . And if the jury find from the evidence that on the 8th day of October, 1921, the said Vincent A. Connolly was and for some time had been in the employ of the Equitable Trust Company of Baltimore, as assistant secretary and as assistant treasurer of the said company, and that about 2.30 o'clock on that day the treasurer of said company, Mr. Hugh L. Pope, confronted the assured with the charge of having misappropriated the funds of the trust company to the extent of several thousand dollars; that the assured did not deny the accusation, but said he would go out

and arrange to get the money to make his shortage good; that the assured thereupon left the office of the trust company, went to the business place of Penn. Loan Company, 629 Lafayette Avenue, purchased an automatic revolver and went out to a remote part of Druid Hill Park and was found there about 5.30 o'clock in the same afternoon with a bullet hole through his temples, and the revolver which he had purchased lying at his side with one of its chambers empty as a result of having been recently discharged, then in the absence of any evidence of facts tending to show that the assured's death was due to accident or natural causes, the conclusion must be it was due to suicide, and unless the jury find that there is some such evidence in this case their verdict should be for the plaintiff for the amount of the premium paid, to wit, the sum of $143.00, and no more.

*Second.*—The jury are instructed that the policies of insurance sued upon in this case contain the following provision: "Suicide—In case of suicide committed while sane or insane within one year from the date on which this insurance shall become effective, the limit of recovery hereunder shall be the premiums paid." It appears from the undisputed evidence that premiums amounting to $143.00 were paid by the assured. Vincent A. Connolly, upon these policies prior to his death. It also appears from the undisputed evidence that the assured, Vincent A. Connelly, came to his death before the expiration of one year from the time the policies went into effect, so that if the assured committed suicide the plaintiff is only entitled to recover in this case the said amount of $143.00. And if the jury find from the evidence that on the 6th day of October, 1921, the said Vincent A. Connolly was and for some time had been in the employ of the Equitable Trust Company of Baltimore, as assistant secretary and as assistant treasurer of the said company, and that about 2.30 o'clock on that day the treasurer of said company, Mr. Hugh L. Pope, confronted the assured with the charge of having misappropriated the funds of the trust company to the extent of several thousand; that the

assured did not deny the accusation, but said he would go out and arrange to get the money to make his shortage good; that the assured thereupon left the office of the trust company, went to the business place of the Penn. Loan Company, 629 Lafayette Avenue, purchased an automatic revolver and went out to a remote part of Druid Hill Park and was found there about 5.30 o'clock in the same afternoon with a bullet hole through his temple, and the revolver which he had purchased lying at his side with one of its chambers empty as a result of having been recently discharged, then in the absence of any evidence of facts tending to show that the assured's death was due to accident or natural causes, the conclusion must be it was due to suicide, and (unless the jury find that there is some such evidence in this case) their verdict should be for the plaintiff for the amount of the premium paid, to wit, the sum of $143.00 and no more.

And the jury are instructed that no evidence has been adduced in this case legally sufficient, even when coupled with the ordinary presumption against suicide to entitle the jury to find that the assured's death was due to accidental or natural caues, or any other cause except suicide.

*Third.*—The court instructs the jury that it appears from the undisputed evidence in this case that the death of Vincent A. Connolly was due to suicide, and therefore the plaintiff is entitled to recover only the amount of the premiums paid on the policies prior to his death, to wit, the sum of $143 and the verdict of the jury should be for the plaintiff for that amount.

*Fourth.*—The court instructs the jury that the law always presumes that a man did not intentionally kill himself, but this presumption may be rebutted or overcome, so that if there is a preponderance of evidence showing that he did commit suicide, if the jury so find, then the jury may find that he committed suicide, unless they shall find from the evidence that his death was due to other causes than suicide.

*Fifth.*—The jury are instructed that, while the presumption of law is that when a man is found dead his death is due to accidental or natural causes, nevertheless this presump-

tion only applies in the absence of facts tending to explain the manner of said death, and when facts of such a character are presented, the jury are then at liberty to determine from said facts whether the death was due to accidental or natural causes, or was the result of the intentional act of the accused.

*Sixth.*—No evidence has been adduced in this case legally sufficient to show that there is any reasonable probability that Connolly's death was due to any other cause than suicide.

The cause was argued before THOMAS, PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*L. Wethered Barroll* and *Wm. L. Marbury,* for the appellant.

*Edward Guest Gibson* and *Charles F. Harley,* with whom was *Burdette B. Webster* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This is a suit upon a life insurance policy and the defence is suicide.

Vincent A. Connolly, the insured, was found dying in Druid Hill Park, Baltimore, on the afternoon of October 6th, 1921, and within a few minutes thereafter died from a pistol shot wound in the head. His life was insured by two policies issued by The Travelers Insurance Company in the sum of $5,000 each. In each of them was a clause providing that

> "In case of suicide committed while sane or insane, within one year from the date on which this insurance shall become effective, the limit of recovery hereunder shall be the premiums paid."

The policies were issued, respectively, April 15th, 1921, and May 18th, 1921.

On refusal of payment by the company, suit was brought by the widow, the beneficiary named in the policies, and the jury returned a verdict in favor of the plaintiff. This appeal is from the judgment entered on that verdict.

The important facts are as follows:

The insured at the time of his death was thirty-one years old. He had a wife and two children, to whom he appeared to be devotedly attached, and his home life was happy. He was always cheerful and never seemed to be depressed. He had been employed for about ten months by the Equitable Trust Company at a salary of $4,250. Prior to that he was in the employ of the Fidelity Trust Company for about fifteen years, part of the time as teller and later as assistant secretary, during which time, as testified by Mr. Pope, secretary and treasurer of the Equitable Trust Company, and a witness for defendant, he probably handled millions of dollars. Mr. Pope also testified that while in the employ of his company Connolly was manager of the Howard Street Branch, and that he was largely instrumental in building up the business of that branch; that he had many friends, was a man of sunny disposition, attractive in manner, of high character, and made many friends for the company, and had the entire confidence of his superior officers; that it was not until a few days before his death that anything happened to bring his character in question; that on October 4th, 1921, Mr. Page, the State Bank Examiner, as a result of an examination made of the branch office the latter part of September, wrote the president of the Equitable Trust Company a letter in which he called attention to the fact that on or about the middle of July Connolly began to draw checks against the company when he had no account with it, these checks aggregating about $1,800, of which there remained at the time of the examination checks amounting to $1,249; that these checks were given to various persons, and were returned to the bank through the clearing house, and when so returned were handled by the bookkeepers and were taken out of the work by Connolly and charged to an account in the general ledger, known as "cash items," that the paid checks were then turned over to the teller, who held them, but did not include them in his settlements; that this conduct of Connolly was not only reprehensible and illegal, but it involved a number of the bank's employees, over whom he exercised authority; that in view of all these circumstances, in the writer's opinion, Con-

nolly should be dismissed. The letter referred to some other
minor irregularities, not, however, reflecting upon Connolly's
honesty. Mr. Pope further testified that, on receipt of this
letter, Connolly was called to the main office of the company
and the contents of Mr. Page's letter were read to him, except
the recommendation of dismissal, and he was asked for an
explanation; that the witness and Mr. Evans, the vice-
president, went to the Howard Street office, made an exami-
nation as to the matters referred to in the letter and took
them up with Connolly, "who explained the matters to our
satisfaction as having been completed and carried to a conclu-
sion, and upon our further talk with the president, after hav-
ing examined the matters in detail, Mr. Evans and I visited
the office of the Bank Commissioner and laid the matter
before him," and requested him to withdraw his recommenda-
tion of dismissal, which he did; that this was on the 4th or
5th of October; that Connolly was never told that his dis-
missal had been recommended; that on the 6th of October the
overdraft sheet, which was daily sent by the branch to the
main office, did not convey the information shown by the
books of the branch office in reference to an overdraft of the
L. F. Johnson Plastering Company's account; that witness'
attention was called to this by some one in his office; that on
examination of the account witness found it was overdrawn to
the amount of about $2,700; that he examined the checks and
found one for $1,200, that had been charged against the
account, on which the cash had been given to Connolly; that
while standing at the teller's window, Connolly, who had
been absent up to that time, came in; that witness addressed
him "in the way I generally did, 'Hello, Vinnie,' and asked
him if he could tell me what he did with the $1,200 he had
gotten on the check that he had signed and which had been
charged against the account of the L. F. Johnson Plastering
Company. He said, 'I had to use that amount of money to
take up a bill or note for material used by the Johnson
Plastering Company for work done at St. Mary's Industrial
School.' I then asked him if he had the right to sign the
checks against the Johnson account; he said he had, as he had

about a fifty per cent. interest in the company. I then asked him if he knew, by the charging of the $1,200 check to their account, that the Johnson account was overdrawn about $2,700. He said, 'That is the first I knew of it'; then I said, 'Vinnie, what are you trying to do?' He answered, 'I am not trying to do anything.' I then asked him if the overdraft had been reported to him that morning, and he said he did not know anything about it; then I asked him to come up to Miss Hunt, who had the work of making out the reports to the main office, showing the overdraft, and in his presence I asked her if she made out the report that morning. She said yes. I further asked her why she had not reported the overdraft to me on the sheet showing the overdraft of the L. F. Johnson Plastering Company, and she looked at me and she looked at Mr. Connolly, and Mr. Connolly said, 'Answer Mr. Pope's question;' and she said that Mr. Connolly had said not to report it to the main office; Mr. Connolly at that point said: 'Mr. Pope, I will go around to Mr. Johnson's office and get a receipted bill showing the payment used with the $1,200; I will be back in a few minutes.' I said, 'All right, I will wait for you.' He went out and did not come back alive."

The witness said this was about 2.30 o'clock in the afternoon; that he waited for him to come back until half past three or four o'clock and then returned to his office; that at about seven o'clock that night an officer from the northwestern section called him over the 'phone and informed him that Connolly had been found in the park with a pistol shot wound in his head.

There was also another item of $1,965, testified to by this witness as having been charged up to the L. F. Johnson Plastering Company account, which apparently was done to enable Connolly to take up a note of his for that amount, which had been secured by a bond for $2,000.

Johnson, a brother-in-law, after Connolly's death, repudiated his authority to charge up these items to that account, and the company credited the account with them and collected

the amount from the bonding companies by which Connolly was bonded.

It is not at all clear, however, from Johnson's testimony at the trial that Connolly had not authority to check on this account. His testimony shows that Connolly was interested in the business of the plastering company, and that Johnson was away from the office a good deal in connection with two important jobs, and that there were times when it was necessary for bills to be paid in his absence, and that Connolly had authority "to sign contracts and things like that"; that there was due his estate at the time of the trial $1,600 from the profits of the business; that "there were lots of times we had material shipped to town with sight bill of lading attached. Being out of town, you understand, it would be no more than right for Mr. Connolly in a case like that, with his interest in our concern, to sign a check like that so we could get the material on the jobs."

"Q. Mr. Connolly told Mr. Pope that that is what he was going out to do; that he paid for some of your materials. As a matter of fact, was not that true that he paid for some of those materials with that check? Ans. Just as I say, a good deal of material is sent with sight bill of lading. That probably might have been the reason; I don't know. I was not in town the day he signed that check, but that is what he told me—a bill of goods had come, and he signed the check. Of course, I don't know. Q. Don't you know that it went for the payment of metal laths? Ans. You see, it has been so long ago, I just don't remember that particular case. At the time I was away, but I recall that some metal lath came in, and I understand that is the reason the check was drawn to pay the sight draft on the metal lath. Q. Were they otherwise paid for except by the giving of that check? Ans. No, sir."

It further appears from this witness' testimony he was out of the city the afternoon of October 6th.

It is not certain that any of the witnesses saw Connolly after he left the office at about 2.30 P. M. until he was found in the park.

Samuel A. Friedman, a pawnbroker, testified that in the afternoon of that day he sold him the pistol which was found by his side. He could not fix the hour. It might have been either before or after the interview between Pope and Connolly. Friedman testified that Connolly said they were terrorizing Forest Park, and every time his wife hung clothes on the line some one would steal them, and he wanted to buy her a pistol for protection from the robbers.

Mrs. Connolly testified that her husband had said he thought he had better get a pistol for their protection, as their house was in a new neighborhood and there had been several robberies, one next door to them.

Several witnesses testified about the finding of Connolly in Druid Hill Park. They do not entirely agree as to the details.

George Allen Martin, a chauffeur, was driving through the park between 5 and 5.30 o'clock. A man driving a car met him, and in passing told him "there is a man dying down the hill." Martin turned back and found Connolly lying under an oak tree flat on his back with a 5.30 edition of an afternoon paper "folded longways down his chest"; that "he had his hands folded like that (indicating) across his chest. When I went up to him the gun was lying about the calf of his leg, about a foot from his leg, and I kicked the gun away from him about a man's length. The man was still breathing; he was having a hemorrhage, and his hat was placed under his head, under the back of his head, and he was lying down hill, his head lower than his feet"; that he left him and went after a police officer; that he did not notice any powder marks on him; that his eyes were swelled out and he had blood on his face; that his hands were folded across the paper.

Several witnesses described the wound. The ball entered the temple on one side of his head and came out the other. The coroner expressed the opinion that it entered on the right side and came out on the left side; the two undertakers thought the appearance of the wound indicated the reverse,

and one of them testified that the coroner, who gave a contrary opinion, asked him in the court room, at the first trial of the case, on which side the bullet had entered, saying he had forgotten, but after talking with him agreed that it was on the left side.    The undertaker further testified that the depression was on the left side; that the course of the bullet was upward from left to right; that part of the brain was found on the right side of the hat.    The uncontradicted testimony is that Connolly was right-handed.

Several witnesses, including the coroner and Dr. Matthews, a surgeon at the Maryland General Hospital, testified that the wound might have been caused by accident, suicide or murder; that it was impossible to tell which.

There are four bills of exception; three relate to rulings on evidence and one to the rulings on the prayers.    The reporter is requested to set out all the prayers in his report of the case.

We find no error in any of the rulings of the trial court.

Plaintiff's prayer is a correct statement of the law, and was, therefore, properly granted.

The burden is upon the defendant to prove suicide.    Defendant's first and second prayers assume facts which were not proved, and might have been refused on that ground. Besides, it is not the law in this State that, because a man has been accused of misappropriating money and, either before or after, purchases a pistol and is subsequently found with a pistol wound through his head, that the burden of proof is then shifted.

Defendant's sixth prayer sought to have the jury instructed that there was no legally sufficient evidence to show that there is any reasonable probability that death was due to any other cause than suicide.    And its third prayer asked for an instruction that it appears from the undisputed evidence that death was due to suicide.    These prayers will be considered together.

In this State, where the burden is upon one to prove a fact, it is not for the court to say whether that burden has been

met, and to withdraw a case from the jury at the instance of him upon whom the burden rests. *Calvert Bank* v. *Katz,* 102 Md. 56; *Lemp Brewing Co.* v. *Mantz,* 120 Md. 176; *Jewel Tea Co.* v. *Weber,* 132 Md. 178; *Beasman* v. *Butler,* 133 Md. 382; *Bell* v. *Steen,* 137 Md. 388; *Taylor v. Robert Ramsay Co.,* 139 Md. 113.

But the appellant contends that the above rule, supported by so many cases, was modified by the following expression of this Court in *Baltimore Life Insurance Co.* v. *Fahrney,* 132 Md. 229, viz.: "To warrant us in so deciding (that is, *as a matter of law* that upon the evidence offered the insured intentionally and designedly took his life) the evidence offered to overcome the presumption of death from accident should be so convincing that there could not reasonably be two opinions touching the result; for if it were otherwise, it would be an invasion of the province of the jury to take the case from it."

In view of the unbroken line of decisions of the Court, both before and since the *Fahrney* case, it should not be understood that this Court intended to go beyond the limitation of the rule in contributory negligence cases, which requires that the undisputed evidence on which a case may be withdrawn from the jury must be furnished by witnesses for the plaintiff. If there are any cases in this State wherein that rule appears to have been modified, it was where evidence from other sources amounted to demonstration. *State use of Bacon* v. *Balto. & P. R. R.,* 58 Md. 482.

No case in this State has been cited, nor have we found any where this Court has held, as a matter of law, that a defense of suicide was established.

But, even apart from the rule above mentioned, we could not say in this case that there was no room for reasonable minds to differ as to the inference to be drawn from the undisputed testimony, even if that test could be applied in a case where the proof relied on for a directed verdict is not furnished by plaintiff's witnesses.

For one thing, it is difficult to understand why a right-handed man, intending to shoot himself, should take the pistol in his left hand.   For the purposes of these prayers we must accept as true the testimony that the bullet entered on the left side, although not undisputed.

And there is at least room for doubt whether there was motive shown sufficient to cause a sound-minded, healthy man to deliberately take his own life.   *Travelers Insurance Co.* v. *Nicklas*, 88 Md. 470; *Royal Arcanum* v. *Brashears*, 89 Md. 624; *Modern Woodmen* v. *Cecil*, 108 Md. 357; *Rossman* v. *Travelers Insurance Co.*, 127 Md. 689; *Baltimore Life Insurance Co.* v. *Fahrney, supra.*

We find no error in the rulings on the testimony embraced in the first three bills of exception.   They were all to the refusal to strike out testimony not admitted subject to exception.   The questions were not objected to.

But, apart from this, we think the testimony was proper on cross-examination.   The witness Johnson was offered by defendant to prove that Connolly had no authority to sign checks on the account of the Johnson Plastering Company. The fact that Connolly told Johnson, before any question was raised at the bank, that "a bill of goods had come, and he signed the check," and that the check was to pay for that material while he was away, was relevant to show good faith on the part of Connolly.

And the fact, brought out by a question of the court, that the material had never been paid for otherwise than by giving that check, was proper as going to show that, while Johnson had denied the authority of Connolly to sign this check, he had gotten the benefit of the proceeds.

*Judgment affirmed, with costs to appellee.*