[No. 36618.    Department One.    November 21, 1963.]

RACHEL T. BURRIER, *Respondent*, v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, *Appellant*.*

*Reported in 387 P. (2d) 58.

*Evans, McLaren, Lane, Powell & Moss, William J. Walsh, Jr.,* and *Barry H. Biggs* (*Richard F. Fricke,* of counsel), for appellant.

*Kahin, Horswill, Keller, Rohrback, Waldo & Moren* and *Clarence S. Lind,* for respondent.

HALE, J.—Plaintiff brings this action to recover on a $10,000 policy of life insurance; the defense is suicide.

On May 2, 1957, the defendant insurance company issued to Ralph O. Burrier its policy in the face amount of $10,000. It contained the following provision:

*"Suicide*—In event of the suicide of the Insured, sane or insane, within 2 years after the date of issue, the amount payable by the Company shall be limited to the amount of the premiums paid."

Ralph O. Burrier was found dead on September 1, 1958, less than 2 years after the date of issuance. To the claim of his widow, Rachel Burrier, the defendant pleaded the defense of suicide under the above provision. From a judgment on the verdict for plaintiff in the face amount of the policy, defendant appeals, assigning as error (1) insufficient evidence to support the verdict and (2) the giving of an instruction on the presumption against suicide.

Many of the circumstances connected with the death of Ralph Burrier point to his suicide; others point to his death by accident. He was 39 years old, lived with his wife and two of his stepchildren on Whidbey Island, and enjoyed good health except for occasional headaches. His headaches were not disabling and did not impair his work or daily routine of life. The family had no serious financial problems, and all of them were steadily employed, including Burrier and his wife. Ralph Burrier liked his work. He liked working his own place and frequently hired out

at farming tasks among neighboring farms, a calling which everyone said he found agreeable.

On the night before his death, Burrier had worked on a sketch for a new combination barn and livestock loafing shed. Less than a week earlier, he and his wife had gone to Mount Vernon to buy some Black Angus cattle and had conferred with a farm finance agency about a purchase loan.

No evidence was given to show that he suffered from mental depression or felt troubled about personal or family affairs; he was not facing any sort of police investigation or civil litigation. His wife said that he had never threatened or even intimated suicide, but, on the contrary, held to the Biblical view that it is a sin. His neighbors and friends deemed him a man of equable, good-natured disposition, and no one testified differently.

The last person to see Ralph Burrier alive, Fred Grimm, sold him a package of cigarettes at Grimm's service station at about 11:45 o'clock that morning. He had known Burrier for several years, and observed nothing strange or unusual in Burrier's demeanor or appearance that morning. The two men had a friendly conversation—Burrier seemed cheerful and free from any depression at the time—approximately 2 hours before anyone learned of Burrier's death.

Ralph Burrier's body was found by his wife when she returned home between 1:45 and 2 p.m. He was lying two or three feet outside the doorway of a shed or outbuilding next to the house, a shotgun close to his feet. The door of the shed was open to a 90-degree angle.

For several months, Burrier had kept his shotgun, a Remington Model 11, semiautomatic, 12 gauge, behind some rolls of barbed wire in the corner of the shed to the left of the doorway. Near it were stored bales of wire. Loose wire was kept in an enclosed bin on the other side of the shed. Farm tools, nails, tires, odds and ends, and the presence of cobwebs made the place a sort of catchall storage shed. The door to the shed, between 2 and 2½ feet wide, opened outward but only to 90 degrees to form a perpendicular to the outside wall. To enter or leave the shed, one had to step over an unusually high threshold or

ledge which projected upward 18 inches from the floor across the bottom of the doorway.

The shotgun was equipped with two safeties, one a safety sear and the other a safety lock, each of which was in good condition. On tests, the gun, if cocked, with the trigger safety off, would not discharge when dropped; but a five or six pound pull on the trigger would fire it.

Ralph Burrier's body showed that the blast from the gun had entered through the mouth. The lower two front teeth were gone, the inside of the mouth and palate were torn and the back of the mouth obliterated. The skull was shattered internally but there was a conflict in the evidence as to whether the skin of the head and skull was broken. A very small exit wound, when compared to the great damage to the skull—which was reduced to the consistency of a "beanbag"—was noted, yet some witnesses had no recollection of an exit wound whatever. The left ear had been ruptured and appeared to have formed an exit channel for part of the blast, as brain tissue was found on the walkway some 20 feet away and in a cherry tree, shoulder high, several feet farther—both of which were to the left of the shed as one faces outside. Since the door would not swing open beyond 90 degrees, the location of the brain tissue could well have been considered by the jury in trying to locate decedent's position and the direction he was facing when the gun discharged, for the door could have served as a shield from one direction or the other.

Examination of the face showed it to be free of wounds but swelling and external discoloration of the area under the left eye proved internal hemorrhage. One witness said that the lower lip had a pronounced burn such as is produced by an open flame; the other witnesses observed no such symptom. Witnesses disagreed as to powder burns elsewhere on the face, some saying that there were none and one stating that he saw pock-like powder marks or burns all about decedent's face—that the marks had the general appearance of tiny dots or pinpoints.

A professional police officer, who had made numerous

investigations of shotgun deaths, testified that the shot from this particular gun would not commence to scatter for a distance of 6 to 18 inches and would remain grouped within an area about the same as that of the barrel opening for that distance. He said that, if the gun were fired directly into the open mouth within a distance of 6 to 18 inches, it might leave no external marks or wounds on the face except for powder burns or flecks, but if fired while the barrel was in the mouth a large exit wound would show. A grayish smudge between the thumb and index finger of the left hand was never identified as a powder burn.

A few hours before his death, Ralph Burrier had told his stepson that he intended to do some plowing and to go pigeon hunting that morning. No suicide note was found; no autopsy was performed. Everyone close to this tragic event seemed to accept it as a suicide at the time.

The facts as summarized invite our attention first to that assignment of error directed to the quantum of proof. We agree with the defendant that there was not the slightest evidence of death from natural causes, or the accidental or intentional intervention of third persons. All causes then must be ruled out save suicide and accident.

When the plaintiff proved the contract of insurance and the death of the insured her case was made. The defendant then perforce assumed the burden of proving suicide by a preponderance of the evidence. *Angelus v. Government Personnel Life Ins. Co.*, 51 Wn. (2d) 691, 321 P. (2d) 545; *Graham v. New York Life Ins. Co.*, 182 Wash. 612, 47 P. (2d) 1029; *Selover v. Aetna Life Ins. Co.*, 180 Wash. 236, 38 P. (2d) 1059. Was there evidence or lack of evidence from which the jury could in good reason find that the defendant had failed to carry this burden?

Two facts are conclusive, *i.e.*, that Ralph Burrier died from a shotgun blast and that the charge entered his body through the mouth. Did he knowingly place the barrel of the gun in his mouth and press the trigger, or was the trigger accidentally actuated at the exact instant when the barrel was pointed at his open mouth, less than 18 inches from his face?

■ Facts pointing strongly to suicide are apparent, but many also point the other way. First, the absence of a note or message of any kind showing an intent to self-destruction, though only a solitary facet of the case, tends to negate the conclusion. Though the existence of a note or message would likely have made proof of suicide conclusive, its absence gave the jury room for analysis and evaluation of the facts. The insured's good health and congenial employment and his equable disposition disparage the idea of suicide. There is a total lack of mental depression or other emotional symptoms usually associated with suicide in this record. His economic situation was good; his family relationships amiable; he had no noteworthy economic problems; and he was facing no situation that might lead to jail, disgrace or dishonor. In short, he seemed a reasonably happy man in early middle life.

Absence of proof as to motive, or reason or intent, does not preclude a finding of suicide but may take the edge off some of the facts from which suicide is deduced. Conversely, proof of motive or reason or intent may so sharply outline the facts of death as to make the proof of suicide overwhelming. Or, the facts of the death alone may compel the finding of suicide, as in *Travelers' Ins. Co. of Hartford, Conn. v. Miller*, 62 F. (2d) 910, as a matter of law. Our case falls within the first two situations.

Associate the act inducing death with proof of serious physical illness, or mental depression, or a suicide note or other communication of intent, and powerful indeed is the proof of suicide. But relate the same acts to proof of good health, normally happy home life, and plans for the future, and the latitude of the jury enlarges to make a different finding possible.

The jury could, from the evidence, accept the view that, at the exact, split-instant of time when the gun discharged, Ralph Burrier faced the gun barrel with open mouth. He may have stumbled when inspecting the muzzle end of the barrel; he may have fallen; the trigger may have caught on some wire that tripped it and recoiled into place. Any one of numerous possibilities come to mind from the lack

of cogent facts, and, though these possibilities are not proof of themselves, they are relevant in determining the ultimate fact.

Men do foolish things and they do dangerous things and they are careless and they die alone, unattended and forsaken, and why they die we sometimes never learn for we know only what we know. The jury did not know that Ralph Burrier took his own life; it was defendant's burden to prove it.

Our attention is next drawn to the assignment of error directed against instruction No. 8 which declared the presumption against suicide the following way:

"The sole issue in this case is whether the deceased died as a result of suicide. Where a deceased dies as a result of a gunshot wound it is presumed that his death was due to accident rather than to suicide. Such presumption remains in the case until it is overcome by any credible evidence to the contrary which points to suicide, but at all times the burden is upon the defendant to prove that the death of the deceased was due to suicide."

Defendant's exceptions fully apprised the trial court of its objections to instruction No. 8, and as a precautionary measure defendant submitted instructions Nos. 9 and 10 with an offer to withdraw them if the court rejected No. 8. In analyzing the assignment of error we find it necessary to consider instructions Nos. 9 and 10. They were given to the jury as follows:

"In the case of a violent death, where natural causes are excluded, the presumption against suicide is overcome, where the preponderance of the evidence is consistent with the theory of suicide, and is at the same time inconsistent with any reasonable hypothesis of death by accident or by the act of another." Instruction No. 9.

"You are instructed that while at the outset there exists presumption against death by suicide, this presumption is not evidence. It merely shifts to the defendant in this case the duty of going forward with the evidence. The presumption here disappears when there is evidence on the subject which, in absence of the presumption, would warrant an inference of death by suicide. However, in the final analysis the burden of proving suicide by a fair preponderance of the evidence still rests with the defendant." Instruction No. 10.

No case from this jurisdiction precisely in point has been called to our attention, nor has our study disclosed any. Hence, we believe that we are considering for the first time whether the jury, in an action on a policy of life insurance, may apply the presumption against suicide to the evidence.

Many reasons are given why presumptions of this sort should not be incorporated in the instructions to the jury: the presumption, as to the existence of a state of facts or conditions, operates simply to enable the party in whose favor it runs to avoid a nonsuit without introduction of evidence. Once it has been determined that the case will go to the jury, so it is reasoned, the presumption has fulfilled its office, and the case should be submitted on the usual basis of the burden of proof and preponderance of evidence without augmenting the weight of the evidence with an instruction on the presumption.

Other theorists declare that, once the party having the presumption in his favor gets past a nonsuit, the instructions on burden of proof and preponderance of evidence take care of the problem, and to give the presumption against suicide to the jury adds a double burden. We accepted this theory when applied to the claimed contributory negligence of an asserted tort-feasor in *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581, when we held it error to instruct the jury on the presumption of due care where the contributory negligence of the deceased was the issue. Since the instructions placed the burden of proving contributory negligence by a preponderance of the evidence upon the party claiming it, and a further instruction was given that contributory negligence was never presumed, the instruction on presumption of due care was thought superflous. See 15 Wash. L. Rev. 71 (1940). Later we took this instruction out of controversy in negligence causes by declaring that the decedent's presumption of due care be abolished where his contributory negligence was in issue, thus leaving the defendant with the ordinary burden of proving deceased's contributory negligence by a preponderance of the evidence. *Mills v. Pacific Cy.,* 48 Wn. (2d) 211, 292 P. (2d) 362.

Transfer of the reasoning in these tort cases to the field of life insurance is now sought by defendant on the theory that, where the defendant at the outset has the burden of proving suicide by a preponderance of the evidence, the presumption against suicide, if given to the jury, saddles the defendant with a double burden. And this, of course, compels us to take a look at the whole field of presumptions —an area we enter now albeit with reluctance. We hesitate to go into the legal area where presumptions abound, for it is a place fraught with danger—in some areas an almost impenetrable jungle, in others a mist-laden morass—where more than one academician has been known to lose his way and, once returned, is never quite the same again.

For presumptions—natural in origin though they may be—having their roots in and drawing their sustenance from the common experiences of mankind, have suffered the artificial but inexorable labeling and classifying processes of the law. There are conclusive presumptions and rebuttable presumptions and presumptions of law and also of fact, and mixed presumptions of either. And then there are dry presumptions (Aren't they all?) but no wet ones, and both natural and artificial presumptions; and then there are pseudo presumptions and violent presumptions, and, of course, there are presumptions which are not really presumptions at all, but mere inferences. Then there are presumptions which are real presumptions, and others which are held to be evidence. 9 Wigmore on Evidence (3d ed.) § 2499, *et seq.*; 20 Am. Jur. § 157; 31 C.J.S. § 115.

Judge Lloyd L. Wiehl, trying to bring some semblance of order to the subject, divides all presumptions into two main classes, conclusive and rebuttable, and subdivides the rebuttable class into mandatory and permissive—but again the mandatory may be referred to as true presumptions whereas the permissive presumptions are really only permissive inferences. Instructing a Jury in Washington, 36 Wash. L. Rev. 378, *et seq.* (1961).

Wigmore seems to eschew the horizontal and vertical methods of classification but groups his presumptions according to subject matter. To name but a few: presumption

of sanity; presumption against fraud; presumption of a continuing marriage; of the negligence of a bailee in returning damaged goods; of agency from the ownership of a vehicle; presumption of death from disappearance; presumption of legitimacy of children born in wedlock; presumption that infants are incapable of crime or of negligence; that foreign law is similar if both have the English common law as a foundation; presumption of ownership from possession of instruments payable in blank or to bearer; presumption that public officials have performed their official duty—in short, the whole field of law is seeded with presumptions, and scarcely a subject escapes them completely.

We recognize that the labeling and classifying processes of the law are indispensable to its understanding and growth and to the teaching of it. For example, when the law prescribes certain duties owed to a business guest, or a social caller, or a licensee or trespasser, it is important that the right classification of one's status be made. But in other areas the classifying and labeling process can be said to be a mere convenience and in reason ought not govern the results. Thus it is with presumptions. What difference does it really make if a presumption is labeled as evidence? Calling it so does not make it so. Many states have employed the evidence label as a device to authorize the presumption against suicide to go to the jury; yet the same courts would have to admit that the presumption of innocence is not evidence although it, too, goes to the jury. Among the cases holding the presumption against suicide to be evidence are: *Wyckoff v. Mutual Life Ins. Co. of New York,* 173 Ore. 592, 147 P. (2d) 227 (1944); *Lewis v. New York Life Ins. Co.,* 113 Mont. 151, 124 P. (2d) 579 (1942); *Bill v. Farm Bureau Life Ins. Co.,* 254 Iowa 1215, 119 N.W. (2d) 768 (1963); *Allison v. Bankers Life Co.,* 230 Iowa 995, 299 N.W. 889 (1941); *Milwaukee Western Fuel Co. v. Industrial Comm. of Wisconsin,* 159 Wis. 635, 150 N.W. 998 (1915); *Mutual Life Ins. Co. of New York v. Maddox,* 221 Ala. 292, 128 So. 383 (1930).

■■ We have said on several occasions that a presump-

tion generally is not evidence. *Kay v. Occidental Life Ins. Co.,* 28 Wn. (2d) 300, 183 P. (2d) 181 (1947); *Gardner v. Seymour,* 27 Wn. (2d) 802, 180 P. (2d) 564 (1947); *Bradley v. S. L. Savidge, Inc.,* 13 Wn. (2d) 28, 123 P. (2d) 780; *Sullivan v. Associated Dealers,* 4 Wn. (2d) 352, 103 P. (2d) 489 (1940); *Morris v. Chicago, M., St. P. & Pac. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119 (1939); *Selover v. Aetna Life Ins. Co.,* 180 Wash. 236, 38 P. (2d) 1059 (1934); *McMullen v. Warren Motor Co.,* 174 Wash. 454, 25 P. (2d) 99 (1933); *Nicholson v. Neary,* 77 Wash. 294, 137 Pac. 492 (1914); and *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18, 114 Pac. 870 (1911). But that does not mean that a jury should never be told of it. The reasons which warrant withholding the instruction on presumption of due care in tort cases (*Hutton v. Martin, supra,* and *Mills v. Pacific Cy., supra*) lose their force when applied to a policy of life insurance. In tort, the rule had its origin in the thought that, since the lips of an accused tort-feasor were sealed in death, fairness at trial required a presumption that he was in due care— this in accordance with the idea that negligence is never presumed but must be proved. But with the growth of automobile law, experience shows that this presumption has not the same force as does the presumption against suicide.

Both parties to a life insurance policy are held to have contracted with knowledge of the presumption against suicide, a presumption derived not as in tort cases from considerations of fairness in the mechanics of the trial but rather from having its roots in the whole human experience, from the deeply held view that man normally clings desperately to life, even at the greatest of costs. The insured is entitled to know, as a contracting party, that, in the event of his death under inexplicable circumstances, or of his disappearance without a trace, or where, as here, evidence can be viewed as consistent with suicide, the death will be presumed accidental rather than suicide.

Such an instruction does not convert the presumption into evidence any more than does the instruction on presumption of innocence in criminal cases constitute evi-

dence against the state. In either case, the presumption simply requires the jury to be a bit more circumspect in applying the evidence, or to take greater pains in weighing the evidence, but it does not affect the quantum of evidence required to prove suicide; for the quantum of evidence necessary to overcome the presumption abides in the collective minds of the jury and cannot be measured or weighed. If the presumption puts some added burden of proof than that prescribed by the ordinary burden of proof, it is a burden held to have been contemplated by the parties when they made their contract of insurance with each other. But we think the instruction does not add to the quantum of evidence necessary to constitute a preponderance in the mind of the jury. It simply gives all of the jurors a uniform standard by which to weigh, evaluate and compare the evidence.

Consider for a moment cases where an automobile driver crashes through the guardrail of a high bridge at night, or catapults into a canyon at a high rate of speed, or someone falls from a high place, or takes a fatal dose of medication not dangerous in prescribed amounts, or a death in the woods from gunshot while hunting, or a drowning where the boat used is found in good condition, or a death caused by carbon monoxide poisoning from a running automobile engine—should not the presumption against suicide be applied in all such cases where life insurance is involved? Frequently all that is ever known is the occurrence producing the death. The state of mind of the victim in each such case may never be known, for there may be no facts proved from which such an inference can be drawn. When the jury is told of the presumption against suicide—with suitable safeguards, of course—they are not given evidence in the case, but, in effect, they are told to make their inferences as to the victim's state of mind with knowledge that ordinarily one does not commit suicide. The jury is left free to find suicide or accident from the same evidence in either case.

That the presumption provides valuable guidance to the jury in understanding the facts has long been known to

the law. *Travellers' Ins. Co. v. McConkey*, 127 U.S. 661, 32 L. Ed. 308, 8 S. Ct. 1360 (1888), involved insurance against death by accidental means, excluding suicide and felonious assault. Insured died of a revolver bullet shot through the heart. The company asserted both death by suicide and murder as defenses. Instructions to the jury said, in part:

" ' . . . The presumption is that the death was not voluntary; and the defendant, in order to sustain the issue of suicide on his part, must overcome this presumption and satisfy the jury that the death was voluntary.'

" . . . 'In order, therefore to sustain the plea of suicide, the defendant must have given to the jury evidence sufficient to *overcome* the presumption to which I have referred, and to convince the jury that the injury from which the insured died was voluntary or intentional on his part.' " (Italics ours.)

Sustaining this instruction, the supreme court said:

" . . . Did the court err in saying to the jury that, upon the issue as to suicide, the law was for the plaintiff, unless that presumption was overcome by competent evidence? This question must be answered in the negative. The condition that direct and positive proof must be made of death having been caused by external, violent, and accidental means, did not deprive the plaintiff, when making such proof, of the benefit of the rules of law established for the *guidance* of courts and juries in the investigation and determination of facts." (Italics ours.)

Nearly a century later, the same court, in a situation where insured met his death from two blasts from a shotgun while alone in his silage shed, and applying the law of North Dakota in *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 3 L. Ed. (2d) 935, 79 S. Ct. 921 (1959), said:

" . . . Proof of coverage and of death by gunshot wound shifts the burden to the insurer to establish that the death of the insured was due to his suicide. . . . Under North Dakota law, this presumption does not disappear once the insurer presents any evidence of suicide. . . . Rather, the presumed fact (accidental death) continues *and a plaintiff is entitled to affirmative instructions to the jury concerning its existence and weight. . . .*" (Italics ours.)

Although, perhaps, it can be correctly said that, in a

majority of the states, the presumption against suicide does not go to the jury, we can point to a host of cases in which instructions declaring the presumption are either set forth in the charge to the jury, or which hold that the instruction should have been so given. Among them are: *Beaver v. Fidelity Life Ass'n,* 313 F. (2d) 111 (1963); *Travelers Ins. Co. v. Bell,* 188 F. (2d) 725 (1951); *Mutual Life Ins. Co. v. Hartung,* 162 F. (2d) 202 (1947); *Wyckoff v. Mutual Life Ins. Co. of New York,* 173 Ore. 592, 147 P. (2d) 227 (1944); *Mid-Continent Life Ins. Co. v. Davis,* 174 Okla. 262, 51 P. (2d) 319 (1935); *O'Brien v. New England Mut. Life Ins. Co.,* 109 Kan. 138, 197 Pac. 1100 (1921); *Modern Brotherhood of America v. White,* 66 Okla. 241, 168 Pac. 794 (1917); *Garbush v. New York Life Ins. Co.,* 172 Minn. 98, 214 N.W. 795 (1927); *Tomlinson v. Sovereign Camp of Woodmen of the World,* 160 Iowa 472, 141 N.W. 950 (1913); *Hood v. Life & Cas. Ins. Co. of Nashville, Tenn.,* 99 Ga. App. 403, 108 S.E. (2d) 884 (1959); *Nichols v. Mutual Life Ins. Co. of New York,* 178 Tenn. 209, 156 S.W. (2d) 436 (1941); *Bryan v. Aetna Life Ins. Co.,* 174 Tenn. 602, 130 S.W. (2d) 85 (1939); *Basham v. Prudential Ins. Co. of America,* 232 Mo. App. 782, 113 S.W. (2d) 126 (1938); *Wainstein v. Equitable Life Assur. Soc.,* 318 Pa. 428, 178 Atl. 502 (1935); and *Travelers Ins. Co. v. Connolly,* 145 Md. 554, 125 Atl. 900 (1924). That there is a swing back to incorporating the presumption against suicide in the jury instructions in life insurance cases, is acknowledged in the comment to Rule 14, Uniform Rules of Evidence.[1]

---

[1] ". . . Among the most common examples are the presumption against suicide, the presumption of death from seven years disappearance without tidings, the presumption that a vehicle driven by a regular employee of the owner was being driven in the course of the owner's business, and the presumption of due delivery to addressee of a letter properly addressed, stamped and mailed. If the basic facts of any of these presumptions are established and the adversary offers evidence contrary to the presumed fact, and thus the existence of the presumed fact is left in dispute, how shall the trial judge submit the issue to the jury?

"One solution would be a rule to the effect that the presumption, having served its purpose, should be disregarded and not mentioned in the instructions. This is the Thayer view and the one embodied in the Model Code of Evidence by a vote of 59 to 42, contrary to the recom-

■ Our own decision in *Selover v. Aetna Life Ins. Co.*, 180 Wash. 236, 38 P. (2d) 1059 (1934), portends the adoption of the instruction in life insurance cases, though the precise question did not there occur. In that case, the action was brought under an accident policy covering death through external, violent and accidental means, but excluding suicide. Insured was found dead from carbon monoxide in his automobile, the motor of which was still running, the car being still in his garage, the doors of which could have been closed either accidentally or intentionally. We said:

" . . . (2) that upon a showing of death by external and violent means, the law raises the presumption that death was accidental, and upon such showing, aided by the presumption, a *prima facie* case for plaintiff is made; (3) that the presumption remains in the case until it is *overcome* by evidence to the contrary; and (4) that suicide is an affirmative defense, and must be established by the defendant by a preponderance of the evidence." (Italics ours.)

When we said that the presumption remains in the case until it is *overcome* by evidence to the contrary, it must

mendation of Professors Morgan and Maguire, the draftsmen of the Code. The Thayer view has been approved in a substantial number, perhaps a majority, of recent decisions which have considered the question. Examples are *Ryan v. Metropolitan Life Ins. Co.*, 206 Minn. 562, 289 N.W. 557 (1939) (presumption against suicide); *Kirschbaum v. Metropolitan Life Ins. Co.*, 133 N.J.L. 5, 42 A. 2d 257, 158 A.L.R. 743 (1945) (same); Decennial Digests, Trial, key nos. 205, 237(4).

"On the other hand, there is a strong argument for the view that the jury needs guidance in this situation if they are to give due effect to the probabilities and frequently the substantive policy on which the presumption is based. Before the Thayer discovery came into vogue, the practice of instructing on the effect of presumptions was the established tradition. Wigmore, who accepted and popularized the Thayer view, nevertheless acknowledged in the last edition of his treatise, the need for advising the jury that they could give special weight to the course of experience as embodied in the presumption. 9 Wigmore, Ev. 2498a, pp. 340, 341, Par: 21, 22 (3d ed. 1940). Examples of recent cases approving the practice of advising the jury of presumptions: *Wellisch v. John Hancock Mutual Life Insurance Co.*, 293 N.Y. 178, 56 N.E. 2d 540, 542, 1944 (quoting judge's instruction on presumption against suicide with seeming approval) . . . " Comment. Rule 14, Uniform Rules of Evidence, p. 171 (Approved by the American Bar Association at its Meeting at Boston, Massachusetts, August 28, 1953).

necessarily be inferred that the presumption be noted in the instructions in order that the jury be informed what it is that must be overcome by the defendant's evidence. The jury are the final arbiters as to the weight of the evidence necessary to overcome the presumption.

The giving of instruction No. 8, circumscribed and qualified by instructions Nos. 9 and 10 in pari materia, accordingly, was not error. Judgment, therefore, is affirmed.

FINLEY, ROSELLINI, and HUNTER, JJ., concur.

HILL, J. (concurring in the result)—I concur in the result. While I am convinced that it was error to give instruction No. 8, I am satisfied that the giving of instructions Nos. 9 and 10 made the error nonprejudicial in this case. I am fearful, however, that the result will be that the three instructions (Nos. 8, 9, and 10) will be hereafter requested and given in similar cases as a comprehensive statement of the law.

Instruction No. 8 reads:

"The sole issue in this case is whether the deceased died as a result of suicide. Where a deceased dies as a result of a gunshot wound it is presumed that his death was due to accident rather than to suicide. Such presumption remains in the case until it is overcome by any credible evidence to the contrary which points to suicide, but at all times the burden is upon the defendant to prove that the death of the deceased was due to suicide."

It should not be given for reasons which are spelled out in some detail in the following decisions dealing with presumptions of various kinds: *McGovern v. Greyhound Corp.* (1959), 53 Wn. (2d) 773, 337 P. (2d) 290; *Mills v. Pacific Cy.* (1956), 48 Wn. (2d) 211, 292 P. (2d) 362; *Hutton v. Martin* (1953), 41 Wn. (2d) 780, 252 P. (2d) 581; *Kay v. Occidental Life Ins. Co.* (1947), 28 Wn. (2d) 300, 183 P. (2d) 181; *Gardner v. Seymour* (1947), 27 Wn. (2d) 802, 180 P. (2d) 564; *Anning v. Rothschild & Co.* (1924), 130 Wash. 232, 226 Pac. 1013; *Scarpelli v. Washington Water Power Co.* (1911), 63 Wash. 18, 114 Pac. 870; *Equitable Life Assur. Soc. of United States v. MacDonald* (1938), 96 F. (2d) 437.

In essence, the reason is that the presumption is not evidence and that, in a case of this kind, it has served its purpose when it gets the plaintiff past a nonsuit. It shifts the duty of going forward with the evidence on the issue of suicide to the defendant, and he must prove it by a fair preponderance of the evidence.

If instruction No. 8 is not given, there is no reason to give instructions Nos. 9 and 10. The combination of the three is like giving a poison (instruction No. 8) and then rushing in with the antidote (instructions Nos. 9 and 10). I am willing to admit the efficacy of the antidote in this case, but it is a dangerous practice.

