## COOPER, APPELLANT, *v.* ROMNEY, RESPONDENT.

(No. 3,367.)

(Submitted March 23, 1914. Decided April 15, 1914.)

[141 Pac. 289.]

*Libel — Words Actionable Per Se — Misconduct ·in Office— "Graft"—Malice—Falsity of Publication—Burden of Proof —Nonsuit.*

Appeal and Error—Correct Result—Wrong Reason—Effect.
　1. If an order granting a nonsuit was properly . made, it will be sustained on appeal even though the reasons prompting it were not sound.

Libel—Officers—Words Actionable *Per Se.*
　2. Words published concerning an officer which impute to him unfitness to perform the duties of his office or want of integrity in their discharge, are actionable *per se.*

　[As to newspaper libel generally, see note in 15 Am. St. Rep. 333. As to what words are actionable *per se,* see note in 116 Am. St. Rep. 802.]

Same—Construction of Language.
　3. In determining whether a publication is libelous *per se,* the language must be considered without the aid of innuendo, and construed in its relation to the entire article in which it appears.

Same—"Graft"—Definition.
　4. As characterizing the conduct of a public officer, the use of the word "graft" sometimes implies actual theft and always want of integrity, and its publication in this sense in a newspaper article is actionable *per se.*

Same.
　5. *Held,* under the above rule, that a publication charging that county commissioners in letting a public printing contract did so without advertising for bids and out of favoritism, with the evident desire "to deflect all possible graft" the publisher's way, and containing a suggestion that a named amount of money was to be "cut up" between the commissioners, if false and unprivileged was libelous *per se.*

Same—Malice—Privileged Publication—Actual Malice.
　6. Under the Code definition of libel (Rev. Codes, sec. 3602), malice is not one of its constituents; its presence or absence becomes material only, in an action for libel, as a circumstance affording a basis for increasing and diminishing the amount of recovery, and in cases involving the question of privileged communication.

Same—Privileged.
　7. In order to found liability for libel upon a communication *prima facie* privileged, actual and not implied malice must be shown.

Same—Complaint—Sufficiency.
　8. *Held,* that a complaint alleging that a libelous publication was false and malicious, alleges in substance that it was false and unprivileged, since, in case of malice, the privilege conferred by subdivisions 3 and 4 of section 3604, Revised Codes, does not exist.

*Appeal from District Court, Ravalli County; John E. Patterson, Judge.*

ACTION for libel by O. C. Cooper against Miles Romney. Plaintiff appeals from a judgment on order of nonsuit. Affirmed.

*Mr. F. C. Webster* and *Messrs. O'Hara, Edwards & Madeen,* for Appellant, submitted a brief; *Mr. R. F. O'Hara* argued the cause orally.

The article set forth in the complaint charges a public officer with dishonest and corrupt motives, and with a dishonest transaction in relation to a public or official act; that the charge of graft therein of itself is libelous, and that it was incumbent upon the defendant in this case to prove the truth of the charges or suffer the consequence. (*Craig* v. *Warren,* 99 Minn. 246, 109 N. W. 231.) The headline, "Graft, the Motive?" may be considered with the rest of the article in determining its general character. (*Landon* v. *Watkins,* 61 Minn. 137, 63 N. W. 615.) "Graft," as applied to officials, *etc.,* stands for dishonesty; dishonest gain by reason of public office, or public or private position; irregular and unlawful means of support; the use of office or position for personal gain without rendering a fair compensating service; to steal or swindle. (*State* v. *Sheridan,* 14 Idaho, 222, 15 L. R. A. (n. s.) 497, 93 Pac. 658; see, also, *Quinn* v. *Review Pub. Co.,* 55 Wash. 69, 133 Am. St. Rep. 1016, 19 Ann. Cas. 1077, 104 Pac. 181.) That the article complained of imputes dishonesty to plaintiff, a public officer, admits of no argument. It is the accepted rule of the law of libel that "language concerning one in office, which imputes to him a want of integrity, or misfeasance in his office, or want of capacity generally to fulfill the duties of his office, or which is calculated to diminish public confidence in him, or charges him with a breach of some public trust is actionable." (Townshend on Libel, and Slander, 255, 256; *Bettner* v. *Holt,* 70 Cal. 270, 11 Pac. 713; *Gove* v. *Blethen,* 21 Minn. 80, 18 Am. Rep. 380; *Larrabee* v.

*Minnesota Tribune Co.,* 36 Minn. 141, 30 N. W. 462; *Augusta Evening News* v. *Radford,* 91 Ga. 494, 44 Am. St. Rep. 53, 20 L. R. A. 533, 17 S. E. 612; *Jarman* v. *Rea,* 137 Cal. 339, 70 Pac. 216; *Tawney* v. *Simonson etc. Co.,* 109 Minn. 341, 27 L. R. A. (n. s.) 1035, 124 N. W. 229.) So, too, it is libelous to impute to anyone holding an office that he has been guilty of improper conduct, or has been actuated by wicked, corrupt or selfish motives. (Newell on Defamation, Libel and Slander, par. 69; *Wofford* v. *Meeks,* 129 Ala. 349, 87 Am. St. Rep. 66, 55 L. R. A. 214, 30 South. 625; *Star Publishing Co.* v. *Donahoe* (Del.), 65 L. R. A. 980, 58 Atl. 513; *Atlanta News Pub. Co.* v. *Medlock,* 123 Ga. 714, 3 L. R. A. (n s.) 1139, 51 S. E. 756; *Woolley* v. *Plaindealer Pub. Co.,* 47 Or. 619, 5 L. R. A. (n. s.) 498, 84 Pac. 473.)

Does the question of privilege enter into the case? We contend that it does not. The article itself does not purport to be a fair, true report, or any report, of a public official proceeding of the board of county commissioners of which plaintiff is a member, nor a statement of any speech, argument or debate in the course of the same. It merely recites its version of the meeting, followed by a tirade of libelous criticism and abuse of the board of county commissioners of which plaintiff is a member. (*Kelly* v. *Independent Pub. Co.,* 45 Mont. 140, Ann. Cas. 1912D, 1063, 38 L. R. A. (n. s.) 1160, 122 Pac. 735; *Neeb* v. *Hope,* 111 Pa. 145; 2 Atl. 568; *Post Pub. Co.* v. *Hallam,* 59 Fed. 541, 8 C. C. A. 201.)

A publication in a newspaper, concerning either a public officer or a candidate for an elective office, which falsely imputes to him a crime, is not privileged, but is actionable *per se,* the law imputing malice to the publisher. (*Moore.* v. *Dispatch Printing Co.,* 87 Minn. 450, 92 N. W. 396; *Commonwealth* v. *Clap,* 4 Mass. 163, 3 Am. Dec. 212; *Curtis* v. *Mussey,* 6 Gray (Mass.) 261; *Aldrich* v. *Press Printing Co.,* 9 Minn. 133, 86 Am. Dec. 84; *Secely* v. *Blair,* Wright (Ohio), 355; *Root* v. *King,* 7 Cow. (N. Y.) 613; *King* v. *Root,* 4 Wend. (N. Y.) 113, 21 Am. Dec. 102.)

*Messrs. C. S. Wagner, E. C. Kurtz,* and *John H. Tolan,* for Respondent, submitted a brief; *Mr. Wagner* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Action for libel. Appeal from a judgment on order of nonsuit. The complaint alleges that on December 10, 1912, the defendant, as editor, proprietor and manager of the "Western News," a newspaper of general circulation in Ravalli county, Montana, did publish of and concerning the plaintiff, a member of the board of county commissioners of said county, the following false and malicious defamation, to-wit:

"Just prior to adjournment the commissioners entered into another contract—with the Hamilton Publishing Company, publisher of the 'Ravalli Republican,' to do and perform the county printing for another period of two years, beginning Jan. 6, 1913, and ending Jan. 6, 1915, at its own price. No bids were called for in this instance, the practice of years being reversed. Knowledge of this transaction involving the letting of this $8,000 contract leaked out quite accidentally. Always heretofore the custom has been to call for bids for the county printing, the largest contract at the disposal of the board. Not so this trip.

"Graft the Motive?

"Behind the revolutionary action of the commissioners, who allowed all other contracts to the lowest bidder after advertising for bids, there appears a very evident motive. It is clear that the commissioners did not desire to let the contract to the lowest bidder, and, fearing a comparison of figures, they arbitrarily awarded the contract without calling for bids, acting secretly in an effort to conceal their action. The interests of the taxpayers, the people who pay the county's printing bills, were never taken into account.

"Why the commissioners should lay themselves open to criticism and condemnation in this way is quite clear. The reason the commissioners did not call for bids, and did not care to save the county money, is that they desired the printing contract to

remain in the hands of the Hamilton Publishing Company, which is generally understood to be controlled by Mr. R. A. O'Hara. And the commissioners, always very partial to Mr. O'Hara, evidently desired to deflect all possible graft and revenue his way. The word 'graft' is used advisedly and very literally, for whenever the county pays more for a commodity to one person or corporation than it could buy the same commodity for elsewhere, the difference is graft—graft of the public's money aided and abetted by the public's servants, the commissioners.

"It is obvious that this printing contract includes a graft of not less than $2,000 per year. Any person may determine this by making a little investigation. Who gets this $2,000 a year? Is it cut up between Messrs. Cooper, Treese and Tillman, or do these gentlemen, merely as an evidence of good nature, permit it to slip through their fingers into the coffers of the mysterious Hamilton Publishing Company?"

It is further alleged, by way of innuendo, that the "commissioners" above mentioned means the board of county commissioners of Ravalli county; that the adjournment referred to is the adjournment of said board on December 7, 1912; that "county printing" means the official printing for Ravalli county; that "Cooper" means the appellant, and "that by the use of the word 'graft' in said publication the defendant intended to convey, and did convey, to the readers of the said 'Western News,' that the plaintiff in his capacity as a member of the board of county commissioners of Ravalli county, Montana, was guilty of a dishonest transaction in relation to a public or official act, which false and malicious defamation tends, and did then and there tend, to impeach the honesty, integrity, and reputation of the said plaintiff, county commissioner as aforesaid, thereby exposing him to hatred, contempt, and ridicule, to his damage in the sum of ten thousand dollars ($10,000.00)."

The answer admits the publication of the article quoted, pleads that it is true, that the publication was without malice, was a fair and true report of the proceedings of a public meeting of the board of county commissioners of Ravalli county held

at Hamilton, on December 7, 1912, in the truth of which he honestly believed, and "that the matter complained of was for the benefit of the public in this, to-wit: That said plaintiff is a public officer of the county of Ravalli, state of Montana, and that the matter published of and concerning him, as alleged in said complaint, was a just and true report and criticism of his public and official acts as county commissioner of Ravalli county, state of Montana, as to the nature and character of the public and official acts of said plaintiff at said meeting."

The reply puts in issue all the affirmative allegations of the answer.

Upon the trial the only evidence produced was to the effect that the plaintiff was at the time of the publication, and still is, a duly elected, qualified and acting member of the board of county commissioners of Ravalli county, and that on December 31, 1912, there appeared in the "Western News" a certain article, the publication of which is claimed to be evidence of malice.

From the grounds of the motion for nonsuit, as well as from certain concessions made by counsel for plaintiff in the argument of the motion, which concessions the trial court caused to be set forth in the bill of exceptions, we assume that the order was made upon the theory that the publication was not libelous *per se,* and therefore plea and proof of special damages were necessary, or else that the complaint shows the publication to have been *prima facie* privileged, and thus to require more evirence of malice and falsity than was presented. We are, however, **[1]** not concerned with the correctness of the theory upon which the order was made. If proper, it must be sustained, even though the reasons suggested may not be altogether sound.

1. To determine whether the matter complained of was of the character commonly denominated actionable *per se,* we need not go beyond fundamental principles as asserted and maintained **[2]** by almost unbroken authority. "When language is used," says Newell, "concerning a person or his affairs, which from its nature necessarily must or presumably will as its natural and proximate consequence occasion him pecuniary loss, its publi-

cation *prima facie* constitutes a cause of action, and *prima facie* constitutes a wrong, without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the term 'actionable *per se.*' " (Newell on Slander and Libel, p. 181; Townshend on Libel and Slander, pp. 157, 158; *Brown* v. *Independent Pub. Co.,* 48 Mont. 374, 138 Pac. 258; *Paxton* v. *Woodward,* 31 Mont. 195, 107 Am. St. Rep. 416, 3 Ann. Cas. 546, 78 Pac. 215.) Of this character are words published concerning a person in office, which impute to him unfitness to perform the duties of such office, or want of integrity in the discharge of such duties. (Newell on Slander and Libel, pp. 69, 168; Odgers on Libel and Slander, p. 297; *Wofford* v. *Meeks,* 129 Ala. 349, 87 Am. St. Rep. 66, 55 L. R. A. 214, 30 South. 625; note to 116 Am. St. Rep. 814, 815.)

In determining whether a publication is libelous *per se,* the [3] language complained of must be taken without the aid of innuendo (*Brown* v. *Independent Pub. Co., supra; Wofford* v. *Meeks, supra;* 25 Cyc. 450) ; but it must be construed in its relation to the entire article in which it appears, for its ordinary meaning may be limited or changed by the circumstances, or by qualifications expressly annexed to its use. (*Paxton* v. *Woodward, supra;* 25 Cyc. 300 *et seq.*)

The offensiveness of the publication in question is specifically alleged to consist in the use of the word "graft." As ordinarily [4] employed to characterize the conduct of a public officer, that word has a well-understood significance. It implies sometimes actual theft, and always want of integrity. That its use in this sense is actionable *per se* is no longer open to question. (*State* v. *Sheridan,* 14 Idaho, 222, 15 L. R. A. (n. s.) 497, 93 Pac. 658; *Gill* v. *Ruggles,* 95 S. C. 90, 78 S. E. 536; *Quinn* v. *Review Pub. Co.,* 55 Wash. 69, 133 Am. St. Rep. 1016, 19 Ann. Cas. 1077, 104 Pac. 181; *Craig* v. *Warren,* 99 Minn. 246, 109 N. W. 231.) While we agree with the defendant that this word must be taken as defined in the article, we do not agree that such definition is

to be found in any single sentence. The article is made up of alleged facts and comments thereon. The facts stated are that the commissioners did a certain thing—not improper, if done in the exercise of their best judgment and discretion—in such a way and under such circumstances as to render it reprehensible. We feel quite certain that no one reading the article could doubt [5] that by the use of the word "graft" the writer meant not merely the difference between what the printing could have been gotten for and what the contract agrees to pay, but it meant that the commissioners had acted in deliberate disregard of the interests of the county and either out of partiality to Mr. O'Hara or out of complaisance toward the Hamilton Publishing Company, or with a view to unlawful profit to themselves. The office of county commissioner is a most important one; it demands the exercise, not only of sound judgment, but of the utmost integrity; it calls for a jealous watchfulness of the finances of the county and in the interest of the taxpayers. To suggest, therefore, that a board of county commissioners has so awarded a public contract that there should result something to "cut up" among themselves is to impute outright dishonesty, and to say that they have deliberately out of favoritism or partisanship ignored the interests of the county, in order that undue profit might accrue to some private person or corporation, is to accuse them of utter unfitness to hold so responsible an office. This, if false and unprivileged, is libel *per se.* (Revised Codes, sec. 3602; *Wofford* v. *Meeks, supra; Schomberg* v. *Walker,* 132 Cal. 224, 64 Pac. 290; *Osborn* v. *Leach,* 135 N. C. 628, 66 L. R. A. 648, 47 S. E. 811.)

2. We say, "if false and unprivileged," for that is the language of the statute. No publication which is not false is a [6, 7] libel; and no publication which is privileged is a libel. With all due deference to *Schomberg* v. *Walker, supra,* we are unable to extract any other meaning from section 3602 of our Code. At the common law the gist of libel is malice, which by a fiction is presumed from falsity, while falsity in its turn is

presumed from the fact of publication. (25 Cyc. 372, 491, 492.) Accordingly, at common law the plaintiff makes a complete case upon showing the publication of matter from which damage may be inferred. In our definition of libel we find no mention of malice; to imply malice from falsehood is useless, because malice is unnecessary. The publisher is liable if his publication be false and unprivileged, though it was made in good faith, from worthy motives, and with the utmost belief in its truth. (*Kelly* v. *Independent Pub. Co.*, 45 Mont. 127, Ann. Cas. 1913D, 1063, 38 L. R. A. (n. s.) 1160, 122 Pac. 735.) The case just cited was decided in rigid adherence to our statute as we are construing it, and the statement which appears in it, to the effect that, because the publication was libelous *per se,* "the law presumes malice in the absence of lawful excuse, even though no spite or ill will is shown," must be taken as an inadvertence. The presence or absence of malice becomes material only as a circumstance affording a basis for increasing or diminishing the amount of recovery, and in cases involving the question of privileged communication. (*Paxton* v. *Woodward, supra.*)

If it be true that, as a constituent of libel, malice has no place, it is equally true that to found liability upon a communication *prima facie* privileged, actual and not implied malice must be shown. Such was the rule at common law (*Coleman* v. *Mac-Lennon*, 78 Kan. 711, 130 Am. St. Rep. 390, 20 L. R. A. (n. s.) 361, 98 Pac. 281; *Press Co.* v. *Stewart*, 119 Pa. 584, 14 Atl. 51; *Myers* v. *Longstaff*, 14 S. D. 98, 84 N. W. 233; *Bacon* v. *Michigan Cent. Ry. Co.*, 55 Mich. 224, 54 Am. Rep. 372, 21 N. W. 324; *Smith* v. *Youmans*, 3 Hill (S. C.), 85; *Hart* v. *Rush*, 1 B. Mon. (Ky.) 166, 35 Am. Dec. 179; *Gray* v. *Pentland*, 4 Serg. & R. (Pa.) 420), and such must necessarily be the rule under our statute, unless we reduce it to a tautological absurdity.

Since, however, the privilege conferred by subdivisions 3 and 4 of section 3604 does not exist if the publication be malicious, [8] a complaint which alleges that such publication was false and malicious alleges in substance that it was false and unprivileged. This much must, however, be alleged in substance, and, if

it must be alleged, it must be proved. (*Yancey* v. *Northern Pac. Ry. Co.*, 42 Mont. 342, 112 Pac. 533.)

In the early stages of development of the law of libel, truth or falsity was of importance only as bearing upon the question of malice. As the outgrowth of judicial antipathy to the rapidly increasing importance of truth as a defense, resort was had to the doctrine that all defamatory matter is *prima facie* false. The task of finding reasons for any product or process of growth is always a thankless one; but the very few authorities which attempt it, so far as the doctrine last mentioned is concerned, ascribe its existence to the presumption that every person is guiltless of crime or wrong. Why this presumption should not have availed to protect the publisher, as well as the person offended, is nowhere elucidated. The plaintiff in a libel suit is doubtless presumed innocent of whatever wrong a publication imputes to him, and the publisher is likewise presumed to be innocent of wrong in making the publication. (Sec. 7962, Rev. Codes.) A presumption is a form of indirect evidence (sec. 7956), and it is valid and effective only until controverted by other evidence, direct or indirect (sec. 7960). So far as presumptions are concerned, the evidence is at equipoise at the very outset of the case. The scales can be made to dip in plaintiff's favor only by the presentation on his part of further evidence. This is but the application to all cases of libel of the generally accepted rule that, where the communication appears to have been privileged, the plaintiff must show, not only actual malice, but falsity in the publication (*Ashcroft* v. *Hammond*, 197 N. Y. 488, 90 N. E. 1117; *Edwards* v. *Chandler*, 14 Mich. 471, 90 Am. Dec. 249; *Briggs* v. *Garrett*, 111 Pa. 404, 56 Am. Rep. 274, 2 Atl. 513; *McIntyre* v. *McBean*, 13 U. C. Q. B. .534), and we see no special hardship in it.

In the view expressed, it becomes unnecessary to ascertain whether the publication in question was privileged, and if so, whether the article of December 31, 1912, was sufficient proof of malice. As the duty devolved upon plaintiff to present some evi-

dence of falsity, and as this was not done, the nonsuit was properly granted, and the judgment must be affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied June 16, 1914.