LEWIS, ADMINISTRATRIX, ET. AL., RESPONDENTS, v. NEW YORK LIFE INSURANCE CO., APPELLANT.

(No. 8,235.)

(Submitted November 19, 1941.  Decided March 18, 1942.)

[124 Pac. (2d) 579.]

152

Messrs. *Poore & Poore* and *Mr. W. D. Kyle,* for Appellant, submitted a brief; *Mr. J. A. Poore* argued the cause orally.

*Mr. L. C. Myers, Mr. T. J. Davis* and *Mr. W. W. Mercer,* for Respondent, submitted a brief; *Mr. Myers* argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

On March 22, 1938, the defendant insurance company delivered to Glenn W. Lewis its policy of insurance whereby it agreed to pay Henry M. and Lura K. Lewis, the parents of the assured. $3,000 upon receipt of due proof of the death of Glenn W. Lewis, or $6,000 if such death resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means, "provided however that such double indemnity benefits shall not be payable if the insured's death resulted directly or indirectly from self-destruction, whether sane or insane * * *." The policy further provides that "in the event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum

equal to the premiums hereon which have been paid to and received by the company and no more."

The insured died on May 8, 1939, in Anaconda as a result of a gun shot wound, and plaintiff alleges that his "death resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means." In its answer the defendant admits that the death resulted directly and independently of all other causes from bodily injury effected solely through external and violent means, but not by accidental means; and further denies that the death was occasioned by the accidental discharge of a gun or by any accidental means. Defendant then sets up the provision of the insurance contract heretofore set out relative to self-destruction and affirmatively alleges that the insured's death occurred as a result of self-destruction by means of a gun shot wound not inflicted by accidental means. The defendant then alleges that $128.12 was paid by the way of premiums on the policy and that that amount had been deposited with the clerk of the district court and it prays that plaintiff take judgment for that sum and no more.

Subsequent to the commencement of the action, Henry M. Lewis died and the plaintiff Lura K. Lewis sues not only on her own behalf but also as administratrix of the estate of Henry M. Lewis, deceased.

The pleadings present the sole question of whether or not the insured died as a result of accidental means. Trial was had before the Honorable R. E. McHugh, judge of the third judicial district for the county of Deer Lodge, sitting with a jury. At the close of all the evidence, defendant moved the court to direct the jury to return its verdict in favor of the plaintiff and against defendant for the sum of $128.12 and no more. The motion was denied and the jury returned a verdict in favor of the plaintiff in the sum of $6,000, plus interest, and judgment was entered thereon. A motion for a new trial was made and denied. This appeal followed.

Defendant specifies many errors. The first two go to the question of the sufficiency of the evidence to justify or sustain the verdict. The evidence adduced on both sides is all circumstantial. Briefly summarized, the facts which clearly appear and which are not in dispute are that on the morning in question the insured arose at an early hour compared with his usual time of rising; that after he had eaten his breakfast he returned to his room; that shortly thereafter the landlady heard a thud in his room and that when she investigated the noise she found the body of insured lying on the floor. Various officers were called and their investigation showed that the insured had a bullet wound in his forehead about midway between the median line of the forehead and the center of the right eye and from one-eighth to one-quarter of an inch above the right brow. The bullet entered the head approximately in a straight line toward the back and made a slight bump on the back of the head slightly above the level of the entrance of the wound on the forehead. There were powder burns on the forehead above the wound and an area of dark discoloration about the size of a quarter which appeared to be smoke or grease from the combustion. Lying on the floor several inches from the insured's right hand was a 38-caliber Smith and Wesson hammerless revolver. On a small table near the body the officers found a revolver cleaning brush and an open bottle of Hoppe's Gun Oil, a fluid ordinarily used for cleaning fire arms. But one shell was found in the chamber of the gun and it had been fired. The shell case was intermingled with others subsequently and it was not produced at the trial.

The greater share of the testimony introduced on behalf of the parties to the action concerned, first of all, the presence or absence of a motive for suicide on the part of the insured. The plaintiff's testimony tending to support the theory of accidental death in substance was that the insured was a young man with a promising future; that he was employed as the manager of one of the local theatres at a good wage; that he had had no difficulties in his work and his employer testified

that he was secure in his position. The testimony is that he had no financial worries; that he was a young man of very cheerful nature and with a pleasing personality; that he planned to be married shortly and there was a great deal in the record to show that he had many plans for the immediate future.

His roommate testified that there was nothing unusual in the insured's conduct on the morning in question. All of the testimony adduced on behalf of the plaintiff negatives very strongly any motive for self-destruction.

On the defendant's part, testimony was introduced to show that the insured's father was in ill health, and that that situation very much affected the insured; and that there was considerable talk on the part of the insured to the effect that he would be required to give up his position at the theatre and go to Roundup, Montana, to look after his father's business affairs. However, there is evidence to show that his job at the theatre would be awaiting him on his return, should he carry out this plan.

The witness Mrs. Kurtz, the keeper of the boarding house at which the insured resided, testified at some length that the insured had for some time prior to his death been depressed, nervous and in general "not himself." She testified that his father's ill health worried the insured a great deal. She gave testimony that after a telephone conversation which she took to be with his fiancee the insured had told her that he did not know whether he loved the girl or not. She testified that during the time shortly before his death the insured, without seeming cause, cried frequently. She further testified that on the morning of his death instead of arising at eleven, his usual hour, he arose some time between six and seven o'clock; that although he groomed himself meticulously in the morning, as was his custom, when he came down to breakfast he seemed very depressed and failed to eat the usual breakfast served but asked her to prepare bacon and eggs, etc.; that he ate a very large breakfast and drank a great deal of coffee, and

that he smoked a great many cigarettes during the course of the breakfast.

The rest of the testimony was largely that of experts who were questioned very thoroughly by counsel for both parties as to whether or not the gun found in the insured's room could be accidentally discharged, it apparently being conceded that the wound was inflicted by that gun. A number of test rounds were fired from the gun. The purpose of most of this test firing was to demonstrate at what distance the gun was from the insured's forhead at the time it was fired. Concerning the various patterns made at various distances in the test firing of the gun at paper targets and the appearance of the bullet marks, etc., around the wound on the insured's forehead, the coroner testified that in his opinion the muzzle of the gun was some thirteen inches from the insured's forehead at the time it was discharged. Testimony was introduced on behalf of the defendant that cast doubt on the reliability of that estimate by reason of the possible difference between the cartridges fired in the test rounds and the cartridge fired in the gun in question, and also as to the effect of firing against paper as compared with flesh, so far as the pattern of the powder marks is concerned.

The expert who testified on behalf of the plaintiff stated on direct and cross-examination, and also upon rebuttal, that in his opinion the gun in question could be accidentally discharged in a number of ways. The expert witness on behalf of the defendant, on the other hand, testified at great length that by reason of the fact that the gun in question had no hammer, that it had a safety device which must be pressed at the same time as the trigger in order to discharge the gun, that the trigger-pull was some thirteen pounds, and by reason of other safety features the gun in question could not accidentally be discharged. He stated that the gun could not be discharged by dropping it.

The witness for the plaintiff testified that it frequently happened that the trigger on a gun was pulled when the one

doing so was under the impression that it was not loaded, and as result thereof the gun was accidentally discharged.

Errors are specified by the defendant touching the admissibility of much of the evidence of the expert witnesses on behalf of the plaintiff and they will be dealt with later.

The chief legal question raised by the testimony above outlined concerns the legal presumption that "where, * * * death is shown as the result of external and violent means and the issue is whether it was due to accident or suicide, the presumption is in favor of accident." (*Nichols* v. *New York Life Ins. Co.*, 88 Mont. 132, 292 Pac. 253, 255; *Withers* v. *Pacific Mutual Life Ins. Co.*, 58 Mont. 485, 193 Pac. 566.)

As in the *Nichols Case*, the question is: Does the presumption, when controverted by the evidence of the defendant, make a sufficient case for the jury? The gist of the defendant's argument on this point is that the evidence adduced to show a motive for suicide, together with the physical facts of the position of the wound in the insured's head and the testimony as to the impossibility of discharging the gun accidentally, overcame the presumption as a matter of law and the presumption ceased to exist. If this were the case, the defendant should have prevailed in his motion for a directed verdict because the plaintiff's case rests on this presumption. The burden of proof rested with the plaintiff to show that death was caused by external, violent and accidental means. (*Tuttle* v. *Pacific Mutual Life Ins. Co.*, 58 Mont. 121, 190 Pac. 993, 16 A. L. R. 601.) There is no direct proof that death was due to accidental means, and without the aid of the presumption plaintiff could not sustain the burden of the proof.

Defendant relies on this language in *In re Wray's Estate*, 93 Mont. 525, 19 Pac. (2d) 1051, 1054; "A disputable presumption, says the statute, may be controverted by other evidence. It is successfully controverted when proof to the contrary satisfactorily overcomes it. By proof which satisfactorily overcomes it, is meant that which sustains the affirmative of the issue—a preponderance of the evidence. In this jurisdiction

civil cases are to be decided according to the greater weight of the evidence, and a bare preponderance in favor of the party holding the affirmative of the issue is sufficient to warrant, and should result in, a decision in his favor. * * * Therefore, when. the evidence preponderates against a disputable presumption, it 'fades away in the face of contrary facts.' '' And upon this language found in the *New York Life Insurance Co.* v. *Gamer,.* 303 U. S. 161, 58 Sup. Ct. 500, 503, 82 L. Ed. 726, 114 A. L. R. 1218, case: "Upon the fact of violent death without more, the presumption, i. e., the applicable rule of law, required the infer-- ence of death by accident rather than by suicide. * * * The evidence being sufficient to sustain a finding that the death was not due to accident, there was no foundation of fact for the application of the presumption; and the case stood for decision by the jury upon the evidence unaffected by the rule that from the fact of violent death, there being nothing to show the contrary, accidental death will be presumed. The presumption is not evidence and may not be given weight as evidence.''

It is the position of the defendant that once satisfactory evi-- dence is introduced within the definition found in section 10500, Revised Codes, the presumption of an accidental death is over-- come as a matter of law. In the decisions of this court prior to that in *In re Wray's Estate* the rule in Montana was, as is well stated in the dissenting opinion of Mr. Justice Angstman,. supra, that:

''I agree with. the result, but I do not agree with the view that a presumption can be overcome, as a matter of law, by what we believe to be a preponderance of the evidence controverting it. Ordinarily, when there is a presumption of a certain fact and positive evidence controverting it, an issue is made for the jury [citing cases] and when the case is tried to the court without out a jury, one is made for the trial judge. It is only when the controverting facts are so overwhelmingly against the presumption that there can be but one reasonable and rational con-- clusion, that the question becomes one of law for the court. [Citing cases] The holding in the majority opinion that a pre-

sumption may be overcome as a matter of law by a preponderance of conflicting evidence is contrary to subdivision 2 of section 10672, Revised Codes, 1921, and to the decisions in *Johnson* v. *Chicago, etc., R. Co.,* supra [52 Mont. 73, 155 Pac. 971]; *Freeman* v. *Chicago, etc., R. Co.,* supra [52 Mont. 1, 154 Pac. 912], and *Renland* v. *First Nat. Bank,* 90 Mont. 424, 4 Pac. (2d) 488, in each of which the evidence controverting the presumption was all one way; it was not even conflicting, and it was still held to present a fact question for the jury.

"I am able to concur in the result for the reason that I think there is no substantial evidence that Ruth is the daughter of James, aside from the presumption; and that the presumption is overcome, not by a preponderance of conflicting evidence, but by all of the evidence in the case, and this so overwhelmingly as to permit of no other reasonable hypothesis."

Counsel for plaintiff urges that this is the better rule by reason of various statutory provisions. We need not discuss this contention of the plaintiff, as will later appear, as even by the application of the rule stated in *In re Wray's Estate,* it is apparent that the evidence adduced, both as to motive for suicide, the safety features of the revolver and the position of the wound, by the defendant did not overcome the presumption that death occurred by accidental means. Ordinarily the jury alone determines whether or not the evidence preponderates one way or another. In the decision in *In re Wray's Estate* subsequently adhered to by this court in *Monaghan* v. *Standard Motor Co.,* 96 Mont. 165, 29 Pac. (2d) 378, and others, this court has announced that in considering the question of disputable presumptions it will determine whether or not the evidence adduced, tending to controvert the presumption, preponderates against the presumption. Applying that rule to the evidence in this case, it is clear that while the testimony would indicate that the accidental discharge of the revolver in question is difficult, yet we cannot say that there is such strength in defendant's evidence as to preponderate in defendant's favor. We cannot, for example, as a matter of law say that the insured might not

have intentionally pulled the trigger without realizing that the gun was loaded and without any intention to commit suicide. A case very similar in facts to the one in question is *Mutual Life Insurance Company* v. *Ford*, 61 Tex. Civ. App. 412, 130 S. W. 769, 777. In that case the deceased was shot through the temple by an Iver Johnson Safety Revolver, which according to the testimony was very similar to the gun here in question. In that case all of the testimony was postive to the effect that the gun in question could not be accidentally discharged, that is, that it could not be discharged without the intentional pulling of the trigger while at the same time exerting pressure on the safety mechanism. The Texas court there said: ''Can it be said that no other inference can be drawn from the evidence than that the insured fired the pistol with suicidal intent, or that it precludes a reasonable doubt to the contrary? We think not. It is true that the evidence might be said to be conclusive that the pistol could only be fired by pulling the trigger; but this in our opinion is not sufficient to completely overcome either the presumption against self-destruction or the presumption of accident. * * * The pistol could have been fired either intentionally or unintentionally by pulling the trigger. Under the evidence, it is as reasonable to suppose that the trigger was unintentionally pulled, as it was intentionally pulled. The fact that the pistol could only be fired by pulling the trigger does not show beyond a reasonable doubt that the insured intentionally fired it. To grant that the pistol could have been intentionally fired by pulling the trigger is but to admit that it could be accidentally fired in the same way.''

Some argument is made by counsel for the defendant that in such situation the discharge of the gun would not be accidental. That contention finds no support in reason nor in law. While the act of pulling the trigger might have been intentional, the result in such a situation would be entirely unforeseen and unexpected, as is the situation in the hundreds of cases occurring every year in which fire arms, due to careless handling, are discharged resulting in the accidental death and injury of

many persons. Strange and wonderful indeed are the circumstances in which persons are killed or injured by the intentional pulling of the trigger of an "unloaded" gun, and it is clear that in such situations the discharge itself and the resulting injuries are accidental. (See *Tuttle* v. *Pacific Mutual Life Ins. Co.*, supra; *Dalbey* v. *Equitable Life Assur. Soc.*, 105 Mont. 587, 74 Pac. (2d) 632; *Wills* v. *Midland Nat. Life Ins. Co.*, 108 Mont. 536, 91 Pac. (2d) 695.)

Defendant urges us to adopt the view announced in the *Gamer* ▉ *Case* to the effect "The presumption is not evidence and may not be given weight as evidence." This court has repeatedly and without exception held otherwise under sections 10600 and 10604, Revised Codes. It perhaps is not correct to speak of a presumption as evidence in spite of the provisions of section 10600 which class presumptions as indirect evidence, in view of section 10602 which directly defines a presumption as a deduction which the law expressly directs to be made from particular facts. Yet that does not require any change in the rule long adhered to by this court that the presumption stands in the face of positive evidence to the contrary except in certain circumstances such as are found in *In re Wray's Estate,* supra, and *Nichols* v. *New York Life Ins. Co.,* supra, and must be given weight in determining the fact question. Section 10604 provides that the presumption may be controverted by other evidence. If the presumption disappeared once evidence to the contrary appeared, there would be nothing for that evidence to controvert. Section 10604 clearly means that when positive evidence appears it stands on one side and the presumption on the other, and the trier of fact must weigh them both in determining the question. This court has adhered to this view throughout its history. The rule that the presumption stands even though controverted is not necessarily based on a theory that it is evidence itself, but upon the statutes. The legislature may define the effect of the presumption as it has and even though, strictly speaking, it is not itself evidence, there is no reason why the legislature cannot require that a proven fact out of which the

presumption arises be given certain probative value which has the effect of evidence. (22 C. J. 82; 20 Am. Jur. 161; *Cooper v. Romney*, 49 Mont. 119, 141 Pac. 289, Ann. Cas. 1916A, 596; *Anderson* v. *Wirkman*, 67 Mont. 176, 215 Pac. 224; *State ex rel. Brown* v. *District Court*, 72 Mont. 213, 232 Pac. 201; *California Packing Corp.* v. *McClintock*, 75 Mont. 72, 241 Pac. 1077; *Maki* v. *Murray Hospital*, 91 Mont. 251, 7 Pac. (2d) 228; *Welch* v. *All Persons*, 85 Mont. 114, 278 Pac. 110; *West* v. *Wilson*, 90 Mont. 522, 4 Pac. (2d) 469; *Johnson* v. *Herring*, 89 Mont. 156, 295 Pac. 1100; *Boyd* v. *Great Northern R. Co.*, 84 Mont. 84, 274 Pac. 293; *Renland* v. *First Nat. Bank*, 90 Mont. 424, 4 Pac. (2d) 488; *Mellon* v. *Kelly*, 99 Mont. 10, 41 Pac. (2d) 49; *Hickman* v. *First Nat. Bank of Great Falls*, 112 Mont. 398, 117 Pac. (2d) 275.) That statutes such as ours are constitutional cannot be questioned. (See 20 Am. Jur. 39, and the many cases there cited.)

This court has not adopted the rule found in the *Gamer Case*, supra, and that is true in the majority of the jurisdictions. For a recent case discussing the Gamer decision and holding as we do, see *Downing* v. *Metropolitan Life Ins. Co.*, 314 Ill. App. 222, 41 N. E. (2d) 297, which was determined on November 3, 1941. We think that reason and the vast number of decisions in this jurisdiction, as well as others, discussing the relative province of the court and of the jury, support what is said in the dissenting opinion in the *Gamer Case* by Mr. Justice Black:

"Nor can I agree that we should approve a general rule governing trials in federal courts which in my judgment transfers *jury functions* to judges. The effect of the decision here is to give the trial judge the right to decide *when sufficient evidence has been introduced to take from the jury* the right to find accidental death from proof of death by violent and external means. This inevitably follows if the presumption, or right of the jury to infer death by accident, 'disappears' whenever the judge believes sufficient evidence of suicide has been introduced.

"Stripped of discussions of legal formulas designated as 'presumptions' and 'burden of proof,' the net result of the rule

of 'disappearing presumptions' is that trial judges in federal courts (irrespective of state rules) have the power to determine when sufficient 'substantial evidence' has been produced to justify taking from the jury the right to render a verdict on evidence which—had the judge not found it overcome by contradictory evidence—would have justified a verdict. The judge exercises this power as a 'trier of fact' although evidence, previously introduced and sufficient to support a verdict, has neither been excluded nor withdrawn.

''Proof of death by external and violent means has uniformly been held to establish death by accident. The extreme improbability of suicide is complete justification for a finding of death from accident under these circumstances. While it has been said that this proof *of accidental death* was based on 'presumption,' in reality—whatever words or formulas are used—what is meant is that a litigant has offered adequate evidence to establish accidental death. To attribute this *adequacy of proof* to a 'presumption' does not authorize or empower the judge to say that his 'adequate proof' (identical with legal 'presumption') has 'disappeared.' If the evidence offered by plaintiff provides adequate proof of accidental death upon which a jury's verdict can be sustained, mere *contradictory* evidence cannot overcome the original 'adequate proof' unless the authority having the constitutional power to weigh the evidence and decide the facts believes the contradictory evidence has overcome the original proof. The *jury*—not *judge*—should decide when there has been 'substantial' evidence which overcomes the previous adequate proof. Here, this Court holds that at the conclusion of plaintiff's evidence the jury had adequate proof upon which to find accidental death, and which would authorize a verdict that insured died as a result of accident, but also holds that, after subsequent contradictory evidence of defendant, the judge (not the jury) could decide that plaintiff's adequate proof (presumption) had 'disappeared' or had been overcome by this subsequent contradictory testimony. This took from the jury the right to decide the weight and effect of this subsequent con-

tradictory evidence. Such a rule gives parties *a trial by judge,* but does not preserve, in its entirety, that *trial by jury* guaranteed by the Seventh Amendment to the Constitution. I cannot agree to a conclusion which, I believe, takes away any part of the constitutional right to have a jury pass upon the weight of *all of the facts* introduced in evidence.''

By reason of our statutes and decisions, we do not agree with the rule announced in the *Gamer Case,* supra. We then find the situation to be this: That all of the evdience in the present case, as to whether or not the death of the insured occurred by reason of accident or suicide, is circumstantial. On behalf of the defendant we have the circumstantial evidence set out above, pointing to suicide. On behalf of the plaintiff the presumption is that the death was accidental. That presumption is aided by the circumstantial evidence set out above pointing to accident as the cause of death. We cannot say, under the Montana rule, that the circumstantial evidence adduced by the defendant standing alone preponderates against the circumstantial evidence adduced on behalf of the plaintiff when aided by the presumption. Hence, in conformity with the universal rule announced in this state, it cannot be said that the circumstantial evidence in favor of suicide points so strongly to that conclusion as to rebut the hypothesis that the decedent's death was brought about by accidental means.

Error is specified in permitting the introduction of certain ▮ testimony as follows: Ralph Thorson, the mayor of Anaconda, was permitted to testify, over objection, that the general reputation of the deceased was good. Defendant urges that, since the reputation of the deceased was not in issue, that evidence was hearsay, immaterial, etc. M. P. Mahoney, chief of police of Anaconda, was permitted to testify that in all of his experience he had never known of a case where any person had taken his life by being shot as the deceased was, and to this testimony objection was made. Helen Cook, deceased's fiancee, was permitted to testify as a witness in the case, and also, upon her identification of it, a picture of the deceased taken some

time before his death was accepted in evidence. The expert witness Walter J. Derzay in his testimony stated that a gun could accidentally be discharged by intentionally pulling the trigger. Defendant objected that such a statement invaded the province of the court and jury. The same witness testified, over defendant's objection, at some length concerning personal experiences he had had and cases which he observed in which, under various circumstances, guns were discharged accidentally. Defendant also objected to certain evidence given by the same witness by way of rebuttal.

We need not determine whether the court erred in admitting the evidence above set out for the reason that an examination of it clearly shows that it all comes within the provisions of section 9191, wherein the legislature has said "the court must, in every stage of an action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect." We cannot believe from an examination of all of the record that this testimony, if inadmissible, could in any way prejudice the defendant. And, on the other hand, it appears clear that the learned trial judge carefully scrutinized all of the evidence which plaintiff sought to introduce with a careful regard for the rights of the defendant as well as of the plaintiff.

The balance of the specifications of error concern the instructions given by the court relating to the presumptions of accidental death, it being the view of defendant that no such instruction should have been given and further that if any instructions on the presumption could be properly given, the ones here questioned improperly shifted the burden of proof to the defendant. In view of what we have said above, the presumption remained at the time the case was submitted to the jury and therefore it was proper and necessary for the court to instruct the jury as to it and as its effect. And the instruction so given did not contravene the rule against comments on the evidence. (*Tackman* v. *Brotherhood of American Yeoman*, 132 Iowa 64,

106 N. W. 350, 8 L. R. A. (n. s.) 974; *O'Brien* v. *New England Mutual Life Ins. Co.*, 109 Kan. 138, 197 Pac. 1100; *Cox* v. *Royal Tribe of Joseph*, 42 Or. 365, 71 Pac. 73, 60 L. R. A. 620, 95 Am. St. Rep. 752; *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661, 8 Sup. Ct. 1360, 32 L. Ed. 308).

The first instruction objected to is No. 9, which reads: "The ▉ court instructs the jury that where a person dies under such circumstances that death might have been caused by accident or might have been intentionally brought about, and there is no preponderance of evidence as to the cause of death, or that death was intentionally brought about, the presumption is that such death was accidental." That instruction properly states the law under the case of *In re Wray's Estate*, supra. (*Nichols* v. *New York Life Ins. Co.*, supra; *Travellers' Ins. Co.* v. *McConkey*, supra; *Provident Life & Accident Ins. Co.* v. *Prieto*, 169 Tenn. 124, 83 S. W. (2d) 251; *Wilkinson* v. *Standard Accident Ins. Co.*, 180 Cal. 252, 180 Pac. 607.) The same instruction in substance was given in the case of *New York Life Ins. Co.* v. *Brown*, 5 Cir., 39 Fed. (2d) 376, and the federal court held the instruction properly given.

Counsel urges that this instruction is in conflict with instruc- ▉ ▉ tion No. 6. We do not believe that that is the case. It is also urged that the instruction in question is contrary to instruction No. 13. That instruction is as follows: "You are instructed that if you believe all the evidence in the case leads as reasonably to the conclusion of suicide as it does to accident, it does not establish either accident or suicide, and in such case your verdict must be for plaintiff in the sum of $128.12 and no more." This instruction counsel urges is correct as a matter of law and that instruction No. 9 conflicts with it and therefore is incorrect, and further that it would tend to confuse the jury.

As we have said, instruction No. 9 correctly states the law. If the instructions are in conflict, which we doubt, and since No. 13 was more favorable to the defendant than No. 9, any doubt created would be of benefit to defendant, and any inci-

dental conflict that might arise as between the two instructions would not be reversible error.

Error is specified in the giving of instruction No. 26. The portion of that instruction objected to is as follows: "A presumption is a deduction which the law expressly directs to be made from particular facts unless declared by law to be conclusive, it may be controverted by other evidence direct, or indirect, but unless so controverted by a preponderance of the evidence, the jury is bound to find according to the presumption." It is urged that this instruction is an incorrect statement of the law and served to shift the burden of the proof to the defendant. The law in this state is well settled on the point, and the instruction was given pursuant to what has been said by this court in *In re Wray's Estate*, supra. An instruction to the same effect was given in *Travellers' Ins. Co.* v. *McConkey*, supra [127 U. S. 661, 8 Sup. Ct. 1361, 32 L. Ed. 308], where after setting up the presumption of accident rather than suicide the court instructed "the plaintiff is therefore entitled to recover unless the defendant has by competent evidence overcome this presumption, and satisfied the jury by a preponderance of evidence that the injuries which caused the death of the insured were intentional on his part." While the appellate court there reversed the judgment and found error in the giving of one instruction, this instruction was approved.

The decision in the *McConkey Case* upon the instruction is discussed by the United States Supreme Court in *New York Life Ins. Co.* v. *Gamer,* supra, and the instruction from which we have heretofore quoted is set out at some length, and the court held that nothing in the instruction served to shift the burden of proof to the defendant. (For decisions holding to the contrary, see the note in 103 A. L. R. 185.) An examination of those decisions discloses that they are to be found in states holding in accordance with the Gamer decision that the presumption disappears when satisfactory evidence appears to controvert it. The instructions given do not contravene the rule as announced in the *Tuttle Case,* supra, and the

*Nichols Case,* supra, to the effect that the burden of proof remains with the plaintiff. The burden of the plaintiff in this case, as in the *Nichols* and the *Tuttle Cases,* is aided by the presumption but the presumption does not remove the burden. See *Brunswick* v. *Standard Accident Ins. Co.,* 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213, where the trial court was reversed for failure to give an instruction to the effect that under the circumstances of the case accidental death rather than suicide is to be presumed, and where the court on the contrary gave an instruction that accidental death was not to be presumed. (See, also, *Wilkinson* v. *Standard Accident Ins. Co.,* 180 Cal. 252, 180 Pac. 607.)

When the instructions complained of are considered with the others given, it is clear that the requirements of the *Tuttle* and *Nichols Cases* as to the burden of proof are met.

Errors are specified in the giving of other instructions, all of which concerned the general propositions heretofore, discussed as to the presumption of suicide, and no further discussion of the question involved is necessary.

Finding no error, the judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON, and ASSOCIATE JUSTICES ANGSTMAN and ANDERSON concur.

MR. JUSTICE MORRIS:

I dissent. The controversy revolves around the one question as to whether or not death was due to accident or was suicide. The evidence which shall be presently analyzed all clearly points to suicide.

In such a legal controversy the plaintiff from the start has the benefit of the presumption that where there is death by violent means and there is no direct evidence of the means of death, such death will be presumed to have been by accident rather than suicide. This is not a presumption grounded upon an express statute of this state, but it is accepted as the general rule in this as well as in most other jurisdictions. (*Nichols* v.

*New York Life Ins. Co.*, 88 Mont. 132, 292 Pac. 253, and other cases.)

The presumption mentioned being the only support for the verdict and judgment, it becomes important to analyze presumptions and determine their particular functions and their proper weight in the rules of evidence. All our statutes on presumptions, sections 10600 to 10606, Revised Codes, were adopted in 1895 from the California Code of Civil Procedure, sections 1957 to 1963, inclusive. The supreme court of California, after seventy years, says: "There seems to be some confusion in the decisions of this state with respect to the extent to which * * * presumptions of law are to be regarded as evidence of facts." (*Mar Shee* v. *Maryland Assur. Corp.*, 190 Cal. 1, 210 Pac. 269, 272.)

It appears to me that the reference to presumptions in our section 10600 has been emphasized and the effect of presumptions broadened at the expense of the definition of presumptions as set down in section 10602. The two sections respectively provide: (10600) "Indirect evidence is of two kinds: 1. Inferences; and, 2. Presumptions." (10602) "A presumption is a deduction which the law expressly directs to be made from particular facts." Presumptions are not generally accepted as evidence. Many authorities hold that presumptions derive all of their probative force from the statutes, regardless of logic or reasoning and that, in effect, is the only logical construction to be placed on section 10602.

IX Wigmore on Evidence, 3rd Ed., section 2491, subdivision 3, says: "It is therefore a fallacy to attribute * * * an artificial probative force to a presumption." And again the same eminent authority in section 2498a of the same volume says: "No one who has recorded his views upon this subject has expressed contentment with the present condition of the law."

That presumptions are not evidence is a rule generally adhered to in all federal courts, being departed from only where federal decisions are grounded on state statutes.

In *New York Life Ins. Co.* v. *Gamer*, 303 U. S. 161, 171, 58 Sup. Ct. 500, 503, 82 L. Ed. 480, 114 A. L. R. 1218, it was said in reference to the presumption in favor of accidental rather than suicidal death in that case: "The presumption is not evidence and may not be given weight as evidence." Eight federal court decisions were cited to sustain that statement. A very decided preponderance of authority is in accord with that holding. (See *Jefferson Standard Life Ins. Co.* v. *Clemmer*, 4 Cir., 79 Fed. (2d) 724, 103 A. L. R. 171, and annotation at page 186.) Our own statutory section 10600, R. C., classifies presumption as indirect evidence, but section 10602 defines a presumption as a deduction which the law directs to be made from particular facts. Necessarily the "particular facts" mentioned in the statute must be established before the presumption can arise. Our code sections on presumptions are *in pari materia* and must be construed together.

Again quoting from IX Wigmore on Evidence, page 336, it is said: "Presumption means that where one or more specific facts are proved, as evidence tending to prove a fact-in-issue, and no evidence negativing the fact-in-issue has been introduced, the fact-in-issue is by rule of law established as proved, without further evidence in the affirmative."

Webster's New International Dictionary says a "presumption" is "an inference as to the existence of one fact not certainly known, from the known or proved existence of some other fact, founded on a previous experience or general knowledge of their connection or founded on a rule of policy of the law." 2 Bouv. Law Dict., Rayle's Third Revision, p. 2678, defines "presumptions of fact" as "Inferences as to the existence of some fact drawn from the existence of some other fact." New Century Dictionary defines "presumptions" as "An inference as to the existence of one fact from the known existence of other facts; an inference in accordance with the common experience of mankind and the established principles of logic, or with the prescribed policy of the law."

22 C. J., section 25, page 82, gives this definition: "A pre-

sumption is an inference of the existence or nonexistence of some fact which courts or juries are required or permitted to draw from the proof of other facts.''

9 Encylclopedia of Evidence, page 877, says: ''Presumptions are ordinarily treated as a part of the law of evidence; logically considered, however, they do not belong to this subject, though often closely connected with it, but rather are rules of legal reasoning, similar in this respect to judicial notice. And many of the so-called presumptions have no connection whatever with evidence, being mere rules of substantive law.''

20 Am. Jur., section 158, page 161 et seq., says: ''A presumption may be defined as a rule of law that attaches definite probative value to specific facts or draws a particular inference as to the existence of one fact, not actually known, arising from its usual connection with other particular facts which are known or proved. It is the conclusion of law which the court draws of the existence of one fact from others already proved. * * * Presumptions must always conform to the commonly accepted experiences of mankind and the inference which reasonable men would draw from such experiences. * * * A matter that is presumed to exist need not be proved as long as the presumption continues in force. *In all cases, however, a presumption must be based upon an ascertained fact.''* See also 10 R. C. L., p. 868, and the numerous definitions on presumptions in 33 Words and Phrases, permanent edition, p. 478, all of which are generally in accord with the foregoing authorities.

It is clearly obvious from these numerous authorities, particularly from our own statutory definition set out in section 10602, that a presumption is not evidence in itself but is merely an inference or a deduction which by arbitrary rule of law is given the effect of evidence. A presumption, standing alone, has no probative value; it rests upon and derives all its force from facts admitted or proven in a particular case, and when the facts are established the law steps in and says: The experience of mankind has demonstrated that when certain facts are shown to exist certain other facts may be reasonably inferred as a logical

sequence, and therefore when the death of a human being occurs by violent means and there is no direct evidence as to the cause of death, the law will presume that such death was due to accident rather than suicide, and no evidence need be introduced to sustain that presumption; it is sufficient in itself until controverted by evidence to the contrary.

Why does the law presume death was by accident rather than suicide in such a case as that at bar? The answer is found in a number of cases. (See 103 A. L. R. 185.) It is said "Mankind instinctively love life and generally shun death," (*Modern Woodmen* v. *Craiger,* 175 Ind. 30, 92 N. E. 113, 114, 93 N. E. 209); and in *Brunswick* v. *Standard Acc. Ins. Co.,* 278 Mo. 154, 213 S. W. 45, 50, 7 A. L. R. 1213, it was said: "The presumption against suicide is a rule of law * * * based on the well-nigh universal human characteristic of love of life and fear of death."

In the case at bar a number of witnesses testified as to the insured's good character, his happy and genial manner and popularity with his associates; he was neat and of good taste in dress, and possessed of those traits of character that meet with general commendation. These are the things that make life worthwhile and furnish the foundation for the presumption against suicide. It was not necessary to present such evidence in behalf of the plaintiff. The plaintiff's cause already enjoyed the benefit of such evidence by reason of the presumption.

A presumption that always applies in criminal actions is that one accused of crime shall be presumed to be innocent until proven guilty. That is a presumption that may not be overcome except by evidence of guilt beyond a reasonable doubt, but the presumption involved in this, a civil action, is, if there be any conflict, overcome by a preponderance of the evidence against it. (Subdiv 5, sec. 10672, Rev. Codes.) Presumptions in criminal and civil actions differ only in the degree of evidence sufficient to cause them to "fade away." They are both derived from rules of law.

With the foregoing rules in mind, we come now to an analysis

174

of the evidence. In addition to the facts mentioned in the beginning, the evidence shows that there was an open bottle of oil and other articles on a nearby table in the room where the tragedy occurred such as are generally used in cleaning a revolver. These facts were obviously put in evidence to give rise to a presumption that the insured was cleaning the revolver and it was accidentally discharged, resulting in his death. How plausible is this theory? The revolver that was the instrument of death was admitted in evidence and is before us. It was made by one of the leading manufacturers of such firearms; it is constructed with safety devices intended to prevent discharge except by intent of the operator; it is admittedly as near "fool proof" as it appears possible to make such a gun; the trigger that releases the plunger that discharges the loaded shell in the chamber must be pressed at the same time the grip on the hand-hold of the gun is made, the two acts necessary to discharge the gun must be made simultaneously; no conceivable manner of fall of the gun when held in the hand or in dropping from the pocket, or off a table or from any other place where it might be left, would result in the discharge of a shell in the chamber; the superior metal out of which such guns are made would not break by a fall from any such height regardless of the substance it struck in its fall. The plunger that discharges the shell is incased in the steel walls surrounding it and other mechanism of the gun, and no force from the outside could reach and discharge the shell unless the surrounding steel wall were broken or removed. The steel wall of the gun was obviously intact when it was seen just after the tragedy. We are necessarily reduced to the conclusion that the insured discharged the gun intentionally. If he did not discharge it with the intention of taking his own life, it necessarily follow that he gripped the handle hold and pressed the trigger at the same time, thus bringing into co-ordination the two mechanical parts necessary to discharge the gun while the gun was pointed at his head, and he did not know it was loaded. If the gun was discharged in the manner thus indicated, why did the insured have it pointed directly at his head?

In considering this phase of the matter, the question naturally arises: What maneuver, in cleaning such a gun, would make it necessary to have the muzzle of the gun pointing directly at one's head? The only answer that appears possible is, if self destruction were not contemplated, that the cleaner desired to look down the inside of the barrel of the gun to discover its condition. The answer to that assumption is that looking down the inside of the barrel of a gun, such as that in evidence, is utterly impossible unless the gun first be broken. Some revolvers are broken by releasing the catch with the thumb at the side and swinging the cylinder out to the left; others, such as the gun in evidence, by lifting the catch at the top just over the rear end of the cylinder, raising the breech and tilting the muzzle downward. By that maneuver the cylinder holding the cartridges is directly before the eye of the holder of the gun, and in breaking the gun the eye is automatically focused upon the mechanism that must be manipulated to break the gun, and the act of breaking would present a loaded shell in the chamber to the vision. It would not be possible for it to escape the eye unless the whole maneuver were done by touch without looking. But assuming that the insured did break the gun while the loaded shell was in the chamber and failed to notice the shell, the shell would be entirely removed from a place where the plunger could be released and come in contact with and discharge the shell.

The insured was not a novice in handling firearms. The evidence shows that he was fond of outdoor life and frequently went fishing and hunting; that, in addition to the revolver before us, he owned another, two rifles and a shot gun. He was familiar with firearms and knew them to be instruments of death. It is not reasonable to assume that one of any sense of caution would point the gun at his head, manipulate its intricate firing mechanism, and pull the trigger unless he intended to kill himself. The insured's acts are in violent conflict with the natural acts and precautions of one possessing the knowledge

and experience the evidence shows him to have possessed, unless he intended to take his own life.

We come next to .the weight or sufficiency of the presumption. On the question as to the quantum of evidence necessary to overcome a presumption it was said in the case of *In re Wray's Estate*, 93 Mont. 525, 19 Pac. (2d) 1051, 1054, in which the legitimacy of a party to an action in a will contest was involved: "When the evidence preponderates against a disputable presumption, it 'fades away.' "

In the case of *Nichols* v. *New York Life Ins. Co.*, supra, in which the question was whether death was by suicide or accident, it was said: "We have then in this case a presumption of accident in favor of plaintiff's claim as against evidence of suicide supporting defendant's contention. * * * There is no statute making proof of death prima facie evidence that it resulted from accident. But even as to statutory presumptions the rule is that the presumption 'fades away in the face of contrary facts.' * * * The presumption against suicide must give way to evidence to the contrary where it all points to suicide as the cause of death with such certainty as to preclude any other reasonable hypothesis. * * * 'It may be stated at the outset that self-destruction is not to be presumed. In other words, the presumption arising from the general conduct of mankind is that a sane person will not destroy his own life. But this is a rebuttable presumption, and easily yields to physical facts clearly inconsistent with it. It is not proof, nor does it stand in the way of proof, and, when sufficient evidence is introduced to overcome this legal presumption, it disappears.' "

It was contended that the testimony of the insured's landlady, Mrs. Kurtz, as given at the inquest, was in conflict with that given at the trial. Her testimony on the two occasions was not in full accord, but I do not think the conflict seriously impaired its value. Her testimony throughout showed unusual solicitude for the welfare of the insured and referred to him as always being happy and jolly up until a short time prior to his death and one of her nicest boarders. None of the witnesses called

by the plaintiff spoke in terms of higher praise of the insured than did Mrs. Kurtz, and her testimony is in the record unimpeached in any material particular. Mrs. Kurtz's testimony, except for the letters written by the insured to his parents shortly before the tragedy, is the only substantial evidence from which a jury or a court could derive any notion as to the insured's frame of mind, his thoughts or purposes, in the days and hours just prior to his death. He visited his father a week or two prior to his death and Mrs. Kurtz testified that on his return he was changed from a happy-go-lucky boy into one frequently in tears.

The insured, working late at night, was usually a late sleeper, and when awakened at his usual hour in the late forenoon would often fall asleep again, and to be sure he would get out on time an electric bell was installed in his room on the second floor and when the bell began ringing in his room, it would continue until it was shut off on the floor below, and his roommate was up and gone some two or three hours as a rule before he got up. On the morning of the tragedy the insured was up about 6:30 o'clock, shaved, bathed and put on one of his best suits, and was working over his bank account when his roommate was ready to go down to breakfast. The insured asked his roommate to help him straighten out his bank account, but was advised that he was late and did not have time but would help later. After the roommate had had breakfast and gone to his place of employment, the insured came down to breakfast. Mrs. Kurtz, looking through the window of the dining room from her work on the lawn, saw the insured was not eating his breakfast. She went in and spoke to him and inquired if she could get anything for him. He asked for scrambled eggs, toast and coffee, stating that he did not care for the fruit and cereal usually served. She fixed what he asked for and while he was eating he smoked nearly a package of cigarettes and drank some eight cups of coffee. The insured returned to his room. Mrs. Kurtz and Mrs. Walsh, a neighbor who had joined her on the lawn, entered the dining room and sat down to visit and have a cup of coffee.

Mrs. Kurtz expressed concern about "Glenn." In a short time they heard a noise as if a door had been slammed. Mrs. Kurtz said: "What was that?" Mrs. Walsh suggested it was Glenn going out the front door, but Mrs. Kurtz remarked that he always came through the dining room when leaving the house and further stated that the noise came from Glenn's room. Being perturbed by the noise and unable to account for it, Mrs. Kurtz went to the insured's room and found his body on the floor in his shirt sleeves with the revolver on the floor not far from his hand. She also noticed the articles on the table used to clean revolvers. She testified she was so overcome with shock that she had to get Mrs. Walsh to telephone to the authorities.

The insured's superior at Anaconda in the management of the movie picture concern testified that the insured could have his job back when the dull season was over, but the insured's letter of April 14th to his fiancee does not show that the insured was at all confident of his employment with the movie concern being continued, and solicited her assistance in getting a position; his next letter of April 27th again expressed concern about a job. His letter of April 22nd to his father was almost entirely about money matters and concern about employment, and stated he expected to arrange to visit his father at Helena on or before May 10th, but expressed doubt about being able to do so on account of finances. His letter of April 14th to his father was entirely about desiring a job with some indefinite reference to money. Mrs. Kurtz's testimony as to the insured's advising her that when he left his job with the movie concern he would have about $20 left is repeated in substance in his letter of April 22nd to his father. The insured was obviously worried about his own future and that of his parents, to whom, it appears, he was deeply devoted. He was disappointed in not being able to continue his education at college, about not having lucrative employment, and not being able to save anything of consequence out of his modest salary; he was perturbed about his father's health and the business affairs of his parents at Roundup.

By virtue of the statutes the jury in this case are made the

sole judges of the effect and value of evidence addressed to them (sec. 10672, Rev. Codes), but "their power of judging of the effect of evidence is not arbitrary, but to be exercised * * * in subordination to the rules of evidence" (subdiv. 1, sec. 10672). It is their sworn duty, when there is a conflict in the evidence, to determine all civil actions in accord with the preponderance of the evidence. (Subdiv. 5, sec. 10672). What does a "preponderance of the evidence" mean? In *Callahan* v. *Fleischman Co.*, 262 Mass. 437, 160 N. E. 249, 250, the supreme court of that state said: "The preponderance which determines the verdict must be a preponderance of credible testimony, not a 'balance of probabilities.' "

In *Troeder* v. *Lorsch*, 1 Cir., 150 Fed. 710, 713, it was said: "To create a preponderance of evidence, the evidence must be sufficient to overcome the opposing presumptions as well as the opposing evidence." In *Mathes* v. *Aggeler & Musser Seed Co.*, 179 Cal. 697, 178 Pac. 713, 714, it was said: " 'Preponderance of evidence' in a civil case means only that the evidence on one side outweighs the evidence on the other." In *United States* v. *McCaskill*, (D. C.) 200 Fed. 332, 333, it was said: " 'Preponderance of evidence' means * * * that which accords best with reason and probability."

Neither court nor jury may disregard unimpeached credible evidence. (*West* v. *Wilson*, 90 Mont. 522, 4 Pac. (2d) 469; *Giebler* v. *Giebler*, 69 Mont. 347, 222 Pac. 436; *Haddox* v. *Northern Pac. R. Co.*, 43 Mont. 8, 113 Pac. 1119; *First State Bank* v. *Larsen*, 65 Mont. 404, 211 Pac. 214; *Harwood* v. *Scott*, 65 Mont. 521, 211 Pac. 316; *Boe* v. *Lynch*, 20 Mont. 80, 49 Pac. 381.)

There is not a scintilla of evidence in the record to support the presumption of accidental death of the insured; it is supported only by the presumption and presumptions are merely inferences drawn from facts. (Sec. 10602, Rev. Codes.) All the facts and circumstances clearly point to suicide.

The judgment should be reversed.

Rehearing denied April 13, 1942.